UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

DEON DAVIS

                                   Plaintiff,

          -against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE

DEPARTMENT, RAYMOND KELLY

As Commissioner of the New York City Police Department,

RICHARD BROWN, as District Attorney, Queens County,

RONALD MARTINY, REBECCA ASMAN, as members of the New

York City Police Department and individually,

JACK RYAN, ED SASLAW, ANA MERCADO AND

GEORGE KANELLOPOULOUS

as employees of the District Attorney's

Office of Queens County and individually

                                   Defendants.

-------------------------------------------------------------------X

**COMPLAINT**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 23 2012 ★

BROOKLYN OFFICE

CV12 - 312

MATSUMOTO, J.

POHORELSKY, M.J.

      Plaintiff, Deon Davis, by and through his counsel, Tracey A. Grant, Esq. alleges the

following facts and causes of action against the above-captioned Defendants:

## NATURE OF ACTION

1.     This is a civil action pursuant to 42 U.S.C. §§1983 and 1988 seeking monetary damages for Plaintiff, DEON DAVIS, due to his malicious prosecution cause by the pervasive misconduct of the Queens County District Attorney's Office ("QDAO") and the New York City Police Department ("NYPD).

2.     Plaintiff was acquitted of all charges by a jury of his peers on December 19, 2011, despite evidence that the key witness for the prosecution. a New York City Police Officer fabricated testimony in order to continue the malicious prosecution of Plaintiff; that the prosecutors in the Office of Queens District Attorney Richard Brown had knowingly relied on this arresting officer's false testimony at the suppression hearing and trial and had knowingly suppressed exculpatory and impeachment evidence.

3.     This lawsuit seeks to hold the Defendant CITY OF NEW YORK liable for the above misconduct under the federal civil rights statute 42 U.S.C. §1983, and *Monell v. Dept. Of Social Services,* 436 U.S. 658 (1978). The misconduct of police detectives and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of criminal suspects and defendants or from deliberate indifference by policy-making officials, acting on behalf of the City of New York,, to such violations. As Plaintiff will demonstrate, both the NYPD and the QDAO, as a matter of policy, their powers of arrest, unlawfully concealed exculpatory or impeachment evidence known as *"Brady"* material, or lied to or misled courts, defense attorneys, criminal defendants in order to cover upon their misconduct. In the rare case where such misconduct was exposed, these

2

agencies took no disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those directed against Plaintiff.

## JURISDICTION AND VENUE

4.      This action arises under 42 U.S.C. §§1983 and 1988.

5.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

7.      Plaintiff Deon Davis is a natural person, who, at all times mentioned herein, resided in Queens County, New York.

8.      At all times mentioned herein, Defendant City of New York was a municipal agency organized and existing under and by virtue of the laws of the State of New York.

9.      At all times mentioned herein, Defendant New York City Police Department ("NYPD") was a municipal agency organized and existing under and by virtue of the laws of the State of New York.

10.      At all times mentioned herein, Defendant RAYMOND KELLY ("KELLY") was at all relevant times the Commissioner of the New York City Police Department, and is named in his official capacity. At all times material to this complaint,

Defendant BROWN acted towards Plaintiff under color of the statute, ordinances, customs and usage of the State of New York and City of New York and within the scope of his employment.

11.    At all times mentioned herein, Defendant RICHARD BROWN ("BROWN") was at all times the District Attorney of Queens Count and is named in his official capacity. At all times material to this complaint, Defendant BROWN acted towards Plaintiff under color of the statute, ordinances, customs and usage of the State of New York, City of New York and County of Queens, and within the scope of his employment.

12.    At all times mentioned herein, Defendant RONALD MARTINY ("MARTINY") was at all relevant times a police officer employed by the New York City Police Department assigned to the 103rd Precinct in the county of Queens, and is named here in his official and individual capacities. At all times material to this Complaint, Defendant MARTINY acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York and the New York City Police Department, and within the scope of his employment.

13.    At all times mentioned herein, Defendant REBECCA ASMAN ("ASMAN") was at all relevant times a police officer employed by the New York City Police Department assigned to the 113th Precinct in the county of Queens, and is named here in her official and individual capacities. At all times material to this Complaint, Defendant ASMAN acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York and the New York City Police Department, and within the scope of her employment.

14.    At all times mentioned herein, Defendant JACK RYAN ("RYAN") was at all relevant times the Chief Executive in the District Attorney's Office, Queens County, acting in a supervisory capacity over Defendants Saslaw, Mercado and Kanellopoulous, and is named here in his official and individual capacities. At all times material to this Complaint, Defendant RYAN acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York, County of Queens and the District Attorney's Office, Queens County, and within the scope of employment.

15.    At all times mentioned herein, Defendant ED SASLAW ("SASLAW") was at all relevant times an assistant district attorney in the District Attorney's Office, Queens County and is named here in his official and individual capacities. At all times material to this Complaint, Defendant SASLAW acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York, County of Queens and the District Attorney's Office, Queens County, and within the scope of employment.

16.    At all times mentioned herein, Defendant ANA MERCADO ("MERCADO")  was at all relevant times an assistant district attorney in the District Attorney's Office, Queens County and is named here in his official and individual capacities. At all times material to this Complaint, Defendant MERCADO acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York, County of Queens and the District Attorney's Office, Queens County, and within the scope of employment.

17.    At all times mentioned herein, Defendant GEORGE KANELLOPOULOUS ("KANELLOPOULOUS")  was at all relevant times an assistant district attorney in the District Attorney's Office, Queens County and is named here in his official and

individual capacities. At all times material to this Complaint, Defendant KANELLOPOULOUS acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New York, City of New York, County of Queens and the District Attorney's Office, Queens County, and within the scope of employment.

18.    At all times mentioned herein, The District Attorney's office of Queens County ("QDAO") is an agency both of the Queens County and of the City of New York. The District Attorney and Assistant District Attorneys of Queens county are agents and employees of both the Queens County and the City of New York.

19.    Both the Queens County and the City of New York are liable for torts committed by County officers and employees such as the District Attorney and Assistant District Attorney.

20.    Hence, Queens County and the City of New York are liable for the torts, as set forth in this Complaint, committed by defendants Brown, Ryan, Saslaw, Mercado and Kanellopoulous and by other employees of the Queens County District Attorney's Office referred to herein and acting within the scope of their employment.

## STATEMENT OF FACTS

21.    On Halloween, October 31, 2007, Plaintiff Deon Davis an African-American male, was 17 year old, living at home with his parents in Queens, New York. Plaintiff was a senior in high school and worked part-time for the school newspaper and as a tutor.

22.    On said date at approximately 10:30 p.m. Mr. Davis was standing on a public sidewalk, near an acquaintance's home on 110th and Brinkoff Avenue. while speaking to

6

his cousin on his cellular phone. Mr. Davis was informed by his female cousin that she needed his assistance back at his aunt's house because a few females were harassing her. Mr. Davis immediately began hurrying down the street, while still on his cellular phone with his cousin traveling towards his aunt's house at 111th and 146th Street, Queens, New York.

23.    Immediately thereafter, Mr. Davis saw a dark colored car speeding by him, which stopped as Mr. Davis looked back at the car. Mr. Davis realized it was the police once the window came down and the driver, stated "Stop" at which time Mr. Davis took a few steps back. The driver, a white male, wearing a police shield, plain clothes and a police vest, exited the vehicle. The officer asked Mr. Davis "What are you doing over here?" during which Mr. Davis explained what had transpired on the cell phone and where he was headed.

24.    The officer frisked Mr. Davis and requested identification at which time Mr. Davis provided a school identification card. Upon reviewing the identification, the officer, whose partner, a male white, wearing plain clothes, had also exited the vehicle. Mr. Davis was told by the officer that frisked him in sum and substance "you have to wait my sergeant is coming over for identification." Approximately 10-15 minutes later, an unmarked police vehicle pulled up and a white male, wearing plain clothes and a police shield exited the vehicle. Said officer asked the other officers if Mr. Davis had been searched, after which this officer stated in sum and substance, "search him again and handcuff him."

25.    Mr. Davis was searched again and handcuffed. The officer recovered nothing from Mr. Davis' person during both searches. Mr. Davis asked why he was being arrested but none of the officers responded. The officer, who instructed that he, Mr. Davis be searched and handcuffed, placed Mr. Davis in an unmarked vehicle and proceeded to drive Mr.

7

Davis to another location, which Mr. Davis later learned to be 109-25 153 Street, Queens, New

York. Mr. Davis later learned this officer to be Det. Martiny.

26.    Mr. Davis, still handcuffed, was left in the vehicle as Det. Martiny exited

the vehicle. Mr. Davis heard a helicopter and observed dogs as he sat in the back of the police

car. Mr. Davis estimated being at this location for approximately 30 to 50 minutes, after which

time, Officer Martiny and another officer in plain clothes entered the vehicle and proceeded to

drive off. Officer Martiny stated to Mr. Davis, while in the backseat, "Do you have any drugs

because we are not narcotics", Mr. Davis told the officers that he was not in possession of any

drugs. Mr. Davis was wearing a black snorkel jacket, with a navy blue hoodie underneath and

blue jeans.

27.    Mr. Davis was taken to the 103rd Precinct, where he was photographed

and fingerprinted. Mr. Davis was instructed to remove his snorkel jacket and to keep on his

hoodie while his photograph was taken. Mr. Davis' mother was present at the precinct but was

not allowed to speak to her. Mr. Davis was kept at the precinct in a holding cell for

approximately 1 hour after which he was taken to central booking. Upon arriving at central

booking Mr. Davis was photographed and again instructed by a Det. O'Donnell to remove his

snorkel jacket, while his hoodie remained on. Mr. Davis remained at Queens Central Booking for

approximately 15-17 hours, until he was arraigned. During the arraignment the prosecution

requested bail in the amount of $100,000. Mr. Davis was represented by a court appointed

attorney and his family appeared in court for emotional support.

28.    The Judge released Mr. Davis on his own recognizance and Mr. Davis'

case was adjourned for grand jury action. At no time was Mr. Davis in possession of a gun or

marijuana, as all charges were fabricated by the arresting officer, Martiny based upon racial profiling. At no time on October 31, 2007 into November 1, 2007 was Mr. Davis at 109-25 153 Street, Queens, New York at said location, except for when he was taken there by Officer Martiny, while in handcuffs.

29.     Mr. Davis was charged with criminal possession of a weapon and unlawful possession of marijuana based upon fabricated police paperwork drafted by Martiny and an accusatory instrument sworn to by Officer Martiny, which was based on allegations Det. Martiny knew to be false. Mr. Davis was subsequently indicted based upon the fabricated testimony of Det. Martiny, who was the prosecution's key witness.

30.     Mr. Davis retained legal counsel and approximately one year after Mr. Davis' arrest, a suppression hearing was held on October 1, 2008. During the suppression hearing Det. Martiny gave fabricated testimony as to his observation of Mr. Davis having been in possession of a gun on the night of October 31, 2007 into November 1, 2007. Det. Asman also gave fabricated testimony surrounding her stop of Mr. Davis on the night in question. On or about October 22, 2008 the trial court ruled that all evidence was suppressed.

31.     Thereafter, prosecutors at Queens County District Attorney's Office proceeded to mislead the court and Mr. Davis for approximately one year, by stating on the record repeatedly that a dismissal of all charges against Mr. Davis was forthcoming. On a date subsequent to the trial court's suppression ruling ADAs Jack Ryan, Ed Saslaw and Ana Mercado traveled to 109-25 153 Street, the scene of the alleged incident in question. These ADA's went to this location in an investigative capacity to obtain information as to the circumstances surrounding the events of the alleged incident.

9

32.    These ADAs contacted Officer Martiny and requested that he meet them at the location as well. During this investigative trip to the scene of the alleged incident, Det. Martiny informed these ADAs that he had provided false testimony during the suppression hearing. Upon receiving this information, these ADAs chose to conceal this exculpatory evidence from the defense as well as the Appellate Division. The Queens County District Attorney's Office filed an appeal as to the suppression of all the evidence in Mr. Davis' case. However, the Queens County District Attorney's Office did attach Det. Martiny's false testimony from the suppression hearing as part of the record in their appeal to the Appellate Division, Second Department.

33.    On November 1, 2010 the Appellate Division reversed the trial court's decision and the case proceeded to trial approximately 1 year later. During the 4 years leading up to trial Mr. Davis refused to take any plea offer and maintained his innocence throughout his malicious prosecution. During the trial Officer Martiny repeatedly gave false testimony, consequently causing his testimony to be impeached by defense counsel. Det. Martiny admitted to the court that he had informed the prosecution of his previous false testimony during the suppression in October of 2008 and again approximately 2 weeks before testifying at the trial.

34.    The Court gave judicial notice to the jury because of the prosecution's failure to turn over exculpatory evidence to the defense, a Brady violation. Det. Asman also testified, again giving false testimony under oath in conspiracy with Det. Martiny to conceal the malicious prosecution of Mr. Davis, based upon racial profiling. As Det. Asman did not at any time on October 31, 2007 into November 1, 2007 stop Mr. Davis at any location. Furthermore,

Mr. Davis has never had any encounter with Det. Asman and has only seen this Detective on two occasions, at the suppression and at trial.

35.    On December 19, 2011 Mr. Davis was acquitted of all charges by a jury of his peers. Almost 4 years later, more than 100 court appearance, over $30,000.00 in legal fees. Mr. Davis finally had an end to a nightmare that began on November 1, 2007, because of Officer Martiny's malicious prosecution of Mr. Davis based on racial profiling, a violation of Mr. Davis' constitutional rights under the United States Constitution.

36.    The District Attorney's Office abused the judicial process by repeatedly providing false and misleading information to the court and defense, in an attempt to buy time to appeal the trial court's decision to suppress all evidence, with the use of false testimony provided by Det. Martiny

37.    On October 22, 2008, The Honorable Judge Alosie rendered his decision, suppressing all evidence in this matter.

38.    On February 5, 2009 the QDAO stated on the record that a motion was filed to re-argue Judge Aloise's decision to suppress all evidence...... the matter was adjourned to March 9, 2009.

39.    On March 9, 2009: The People: "We received the Court's decision not granting the decision to re-argue and that the Court is adhering to a certain time. I request three weeks to find out if they want to appeal or start the dismissal process. I don't have an objection to excusing the defendant." The Court: "There is nothing for you to do or your lawyer. It's up to the District Attorney whether they are going to appeal my decision or not. If they are going to appeal that means the evidence can't be used against you. They need three weeks to reach a

decision. So I will see you back here on April 6; and at that time you will know what happens with your case." Adjourned to April 6.

40.    On April 6, 2009: The People: "I spoke to Ms. Daniels this morning. She has done a dismissal memo of the case and submitted it to MR. Catarisano. I advised counsel that it takes awhile. I will be asking for 2 or 3 weeks. I have no problem with the defendant being excused." Adjourned to May 7, 2009.

41.    On May 7, 2009, the matter was again adjourned by the Court, as the QDAO still did not have the dismissal order, and the matter was put over to June 30, 2009.

42.    On June 30, 2009: The People: "Judge, on this particular matter, this is a matter where, I think, a dismissal order was submitted. It was sent back and resubmitted and it went up to Mr. Masters. I was just speaking to Mr. Catarisano, and we have been trying to track it down for the last half hour. Unfortunately both Mr. Ryan and Mr. Masters are in a meeting with the Police Department in Manhattan. We checked with secretaries and they weren't able to get an update on this. If we could have the last week in July, if Miss Sales doesn't want to come in, if there's going to be a dismissal, we can handle this on our own without inconveniencing her." Defense Counsel: "Your Honor, this is like the fourth or fifth time we have been here for this dismissal memo." The People: "Judge DeMakos did a hearing. I believe the statement and the weapon were suppressed. I assume it was a gun case, and I know that they made a re-argument, Court rejected, decided not to appeal it and it's been winding its way" The Court: "I'm sure you passed the time, in any event." The People: "Judge, again I can't dismiss this on my own." The Court: "Come back one more time, please. August 3rd or 4th" Defense counsel:

"August 3rd is fine" The Court stated: "Thank you, August 3rd If not, I will dismiss it on my own."

43.    On August 3, 2009: The People: "Yes. This was a dismissal memorandum that's winding down. I already checked. Ms. Daniels is out. I tried to talk to the other person, Mr. Scheer and he's stuck in AP6. I don't want to keep counsel. I have no problem if we excuse counsel next time." The Court: "Pretty soon you will be excusing the Court. What's happening, Mr. Fogarty, are you dismissing the or - - "The People: "I have no idea." Defense Counsel: "Judge, respectfully, this case has been going on forever. It's an utter atrocity. This young gentleman and his family have been suffering needlessly. This case should have been dismissed eons ago." The Court: "second call. Get Ms. Daniel's Bureau Chief up here please." The People: "For the People, Frank Catarisano." The Court: "Mr. Catarisano, what are we doing with this case, sir?" An off the records discussion was held by and between counsels and the Court at the sidebar. The Court: "The case is adjourned. It's on for September 9$^{th.}$ Mr. Cataarisano, and get this thing done. If it's not dismissed the Court will dismiss is sua sponte."

44.    On September 9, 2009; The People: "It is my understanding from speaking with Miss Daniels, People will not dismiss. I believe Mr. Catarasano had recommended it."The Court: "The people are asking for an adjournment?" The People: "Yes" The matter was adjourned to September 29, 2009. It should be noted that defense counsel and Mr. Davis' appearance on September 9, 2009 were excused, yet the Court allowed this adjournment exparte.

45.    On September 29, 2009: The People: " It is my understanding, Judge, this matter is being appealed on the Court's decision to suppress the evidence in the case." Defense counsel: "yes your honor, and I object, due to the time line the decision rendered by your Honor

was rendered almost a year ago on October 22nd 2008, suppressing all of the evidence in this matter. On subsequent court appearances we were instructed by the DA's office on almost every court appearance they would be dismissing the case and they were waiting for a signature. Now, almost a year later we receive a notice of appeal that they are going to appeal."

    46.    The record evidences the District Attorney's disregard for the judicial system and the due process rights of Deon Davis. As, the District Attorney's Office had no intention of ever dismissing this matter, but rather used the Court to their advantage in order to buy time while their office came up with a plan to conceal Det. Martiny's false testimony and use said false testimony to the office's advantage in their appeal to the Appellate Division, Second Department.

    47.    <u>Det. Martiny's testimony at the suppression hearing is in contradiction to his testimony at trial</u>

    48.    On October 1, 2008 during the suppression hearing Det. Martiny was asked by the prosecutor what he observed, Mr. Davis do, at which time Det. Martiny testified to the following "he immediately came down the stairs. now he's coming towards me and then he went down the property line of the building. As he did that, he removed a gun with his right hand from his waistband", When asked by the prosecutor what Det. Martiny saw Mr. Davis do with that gun, Det. Martiny testified, " proceeded down the building line, and then he placed it on the ground near the back of the building.". Det. Martiny also testified, "I recovered the gun and the defendant hopped over the fence."

    49.    On cross examination, Det. Martiny stated that "he was on top of the

staircase. As I said, then police, hey, I v ant to speak with you, something to that effect, he came down the stairs and immediately when he came down, he retrieved the firearm with his right hand from his waistband.

50.    When asked by defense counsel "so he was facing you and he pulled it out in front of you basically, is that what you're saying?" Det. Martiny testified "He came down the stairs. As he--just his body was sort of blaited towards me, so it wasn't his back or his front, and he just removed it from his waistband." Defense counsel then inquired "but this is basically right in front of you? about how far away are you from him?" Det. Martiny stated "I'm about two car lengths from him", defense counsel, "what's that, about 25 feet?" Det. Martiny stated, "yeah, approximately."

51.    Defense counsel then asked  " so he's walking towards you somewhat. he pulls out a gun somewhat? And then what do you do" you just stand there?" Det. Marinty replied "No. He definitely does pull the gun out of his waistband and he hurriedly, almost runniingly walks - - if that's a proper word - - sorry. He runs down the property line and he places that gun on the ground." Defense counsel asks "what do you mean "property line?"
and Det. Martiny states "The property is divided by a fence."

52.    Thereafter on November 28, 2011 Det. Martiny testified at the jury trial of Deon Davis

53.    Det. Martiny testified on direct and under oath that on October 31, 2007 to November 1, 2007, he assigned  was to the 103rd precinct, anti-crime unit and that he was working from 6 p.m. to 2 a.m. Det. Martiny testified that he was driving an unmarked police car

and was heading westbound on 109 Road, along with his partner. Det. Martiny testified that at

about 12:28 a.m. he observed three males, standing at the corner of 153rd Street while Det.

Martiny's vehicle was approximately a block away. Det. Martiny recalled a street light at 153rd

Street and 109rd Road, during nighttime conditions. Det. Martiny testified that as he drove

closer 9to the 3 male blacks they disbursed.

54.    Det. Martiny testified that one of the male blacks was Mr. Davis whom he

identified in the courtroom. Det. Martiny did not get a look at the defendant's face. Det. Martiny

testified that he was able to see the defendant's clothing, that he was male, his race and his body

type.

55.    Det. Martiny testified that the defendant was not alone as he traveled

down 153rd street, but was alone upon arriving at the side entrance of 109-25 153rd Street  and

that prior to arriving at that address the defendant was not alone as he traveled down 153rd street.

Det. Martiny further testified that he was approximately 10 feet away from when he observed the

defendant at the side entrance of 109-25 153rd Street.

56.    Det. Martiny testified "the defendant had his hand on the door knob. He

looked back at me. I looked at him. I made eye contact with him and he just had his hand on the

door." Det. Marty stated that he was about 20 feet away in his car during this observation.

Det. Martiny testified that he made eye contact with the defendant long enough to see his facial

features and his clothing, "while the defendant was at the top of the staircase for approximately

10 seconds." Whereupon Det. Martiny got out of his car and identified himself as a police

officer, stating "Hey, police. I want to talk to you." And that as soon as he got closer to the defendant, the defendant ran down the property line of 109-25 153rd Street.

57.    The judge asked Det. Martiny whether "the defendant had to go down something?" Det. Martiny apologized for leaving out the fact that he had actually observed the defendant, "walk or hurriedly walk down the staircase."

58.    Det. Martiny went on to testify that the defendant was not heading in his direction, but rather heading away from Det. Martiny. And that as Det. Martiny approached the defendant "kept running or walking at a fast pace to the rear of the property."

59.    Detective Martiny's testimony testified that as the defendant went down the staircase on the other side of that landing, his hand was empty and his right hand went towards his waist, his mid section.

60.    Immediately thereafter, Det. Martiny, changed his testimony by stating that the defendant, "walked or hurriedly walked down the staircase" and that the defendant was not heading in Det. Martiny's direction, rather the defendant was heading away from Det. Martiny down the property line of 109-25 153 Street.

61.    When asked by the prosecution what exactly Det. Martiny saw the defendant do as he left the staircase, Det. Martiny testified that as the defendant left the staircase he went down the staircase on the other side of the landing and he went along the property line of the fence.

62.    Mr. Martiny testified: " As the defendant went down the staircase on the other side of the landing, his hand was empty and the right hand went towards his waist, his

midsection of his body, Now when that hand came out, it was holding the gun that I recovered from him."

63.     The Court asked Det. Martiny, "You didn't say from him. That you recovered."

at which time Det. Martiny stated, "That I recovered. I am sorry, Your Honor."

The Court then asked Det. Martiny, "It wasn't recovered from his person correct?"

Detective Martiny replied "No I worded that wrong, Your Honor, I am Sorry."

64.     ADA Kanellopoulous then asked Det. Martiny, "Now where were you when you saw this gun come out as you say and into the defendant's hand?"

and Det. Martiny replied, "I was at the front of the staircase and I am traveling upon the staircase in the front heading towards the top of that landing."

65.     ADA Kanellopoulous asked Det. Martiny approximately how far was the defendant to him when he made this observation? and Det. Martiny responded "I would say that's about two car lengths, maybe 20 feet."

66.     ADA Kanellopoulous then asked Det. Martiny what did he do when he saw the defendant with this firearm in his hand? Det. Martiny responded, "I had my firearm out and pointed at the defendant."

67.     ADA Kanellopoulous asked Det. Martiny if he remembered giving any type of command at that point. and Det. Martiny replied, "Yep. Yes I did."

68.     ADA Kanellopoulous then asked Det. Martiny, what did he say?

and Det. Martiny stated "I yelled out "gun" just to give the heads up to my partner and I said police, drop the gun."

69.     ADA Kanellopoulous asked Det. Martiny if he knew where his partner was at that point?" and Det. Martiny replied "No, I don't."

70.     ADA Kanellopoulous asked Det. Martiny what he saw the defendant do after he pulled out this gun. and Det. Martiny responded "He continued running down alongside that green fence following if to the back of the property."

71.     ADA Kanellopoulous asked Det. Martiny what happened next. and Det. Martiny: "I maintained my distance. I am about, I am on the other side of the staircase, if I remember correctly down that staircase on the back side of the landing. And defendant took the gun with his hand and sort of placed it on the ground."

72.     ADA Kanellopoulous asked Det. Martiny what he meant by placing it? Asking him to be a little more specific as to what exactly he saw. And Det. Martiny stated, "I saw the defendant with his hand, his right hand. he had it still maintained in his right hand. And as he got to the back of the property he took that right hand and placed it on the ground. I would say it was a little tossed. it wasn't like if you placed a cup on a table top. It was a little toss to it. But it wouldn't be as placing it wouldn't be like placing a cup on a table top."

73.     On cross-examination Mr. Rankin asked Det. Martiny how he explained the discrepancy he made before this jury that the person he saw walk down the steps to the back and telling a Judge Thomas Demakos back on October 1, 2008 that the perpetrator slid in between the steps and the staircase? at which time Det. Martiny stated, "Thank you for the opportunity. I was mistaken. After the testimony on the date, I went back to the location and the staircase that

was previously there, I looked at it again and I was mistaken and that's the only way I could explain that."

74.    Mr. Rankin then asked Det. Martiny if he said on direct on October 1, 2008 that the person squeezed down the property line. Det. Martiny stated, "That's not what it says there" after which Mr. Rankin stated "That's not what it says? What I read there is what it says right?" Det. Martiny then said, "Yes, it does, ran down the property line."

75.    Mr. Rankin, then asked Det. Martiny what he meant by that when he says ran down the property line in his testimony on October 1, 2008? Det. Martiny responded. " The fence in the photo that I indicated before, to me it's the property line that divides each house from one another."

76.    Thereafter, Mr. Rankin asked Det. Martiny if when he said "ran down the property line" in his testimony on October 1, 2008,  to explain what he meant based on this picture, ran down the property line, what did he mean? Det. Martiny responded, "Down that alleyway next to that fence" at which point Mr. Rankin asked Det. Martiny, what alleyway? The Court interjected asking Det. Martiny if he was talking about the alleyway depicted on the right hand picture of what is that People's Exhibit 4?

77.    The Court asked Det. Martiny if it was the right hand photograph of People's 4 running down the alleyway depicted on that photograph, at which point Det. Martiny replied, "Yes, Your Honor. It's also depicted on the left one."

78.    Mr. Rankin then asked Det. Martiny if he didn't mean on your direct examination fitting in between the fence and the wood, at which time Det. Martiny replied, "Not that testimony"

79.     Mr. Rankin then asked Det. Martiny if on October 1, 2008 on his direct examination, if he did not mean to say that the defendant, the person he saw, squeezed in between the fence and the wood. Det. Martiny replied, "Correct" and Mr. Rankin clarified by asking Det. Martiny, if what he meant to say and what he believed at that point is that the person had gone down the steps like he testified here today? and Det. Martiny replied, "Yes"

80.     Mr. Rankin asked Det. Martiny if that was what he believed. and Det. Martiny said "Yes." Mr. Rankin asked Det. Martiny if he was certain of that."and Det. Martiny replied, "Yes."

81.     Mr. Rankin then asked why did he have to go back later on to say and realize he made a mistake because if he never made a mistake. Why diddle go back to the house?

82.     Det. Martiny replied, "I am human so I make mistakes. When I reviewed my testimony after this hearing, pretrial hearing we're talking about, I saw the minutes later on and I was saying to myself there's no way that a person humanly could squeeze himself like a cartoon character through that area so I was just either, just mistaken at that time."

83.     Mr. Rankin then asked if it was possible he was making a mistake about his identification of the defendant? Det. Martiny replied, "The identification of the defendant was never in issue ever in this case to me."

84.     Mr. Rankin asked Det. Martiny if wasn't possible just like he made two mistakes in his sworn testimony back in October 1, 2008 that he is mistaken again? Det. Martiny replied, "of the defendant carrying a gun and me identifying him, no way."

85. Det. Martiny changes his testimony at trial upon realizing that his fabricated testimony during the suppression hearing does not coincide with the physical layout of the scene of the incident, after having visited the scene with prosecutor's post-suppression hearing and prior to the trial

86. On November 28, 2011, the following was stated on the record by the Court"All right, Detective. We have been discussing issues related to the fact of when

you learned that your original suppression hearing testimony was inaccurate. This particularly in reference to the defendant's squeezing between some area between the fence and the alleyway. Okay? Now, we are for the record clearly outside of the presence of the jury and I am inquiring of the witnesses. Now, it is not in fact the case, Detective, that shortly after the original suppression hearing was held, and I want to be very clear on dates again, so just bear with me. I will look at the court file again for the record. Shortly after the original suppression hearing was held and the report—there was a decision by a judicial hearing officer dated October 22, 2009 and then a Judge ruled that he was suppressing the gun, detective. Isn't it fact that within a short time after that, within weeks or certainly within a month of that decision you went out with certain ADA's from the Queens D.A.'s Office, actually Appeals Bureau D.A.'s to figure out whether or not, you know, to get a sense of what the scene looked like. And also to determine whether or not you were actually accurate in your pretrial suppression hearing. And we are going back to when I say 2008, do you recall doing that? We are talking like three years before you just visited the scene recently. Do you remember doing that with other ADA's?"

87. Det. Martiny:" Yes, Your Honor."

88.    The Court: "Because right now as things stand the jury has heard that was in the last couple of weeks you learned you were mistaken, that's not correct, correct?"

89.    Det. Martiny:" Correct, Your Honor."

90.    The Court: "So you do recall going to the scene, that was after the original Judge said I am suppressing the gun. You know what that means, right?"

91.    Det. Martiny: "Yes, Your Honor."

92.    The Court: "The D.A. can't use the gun, there is no gun, there is no gun case anymore. So you went out to the scene with certain A.D.'s?

93.    Det. Martiny: "Yes, that's correct."

94.    The Court: "It was at that point that you told them, no, I could not have been correct in the way I testified at the original hearing. Correct?"

95.    Det. Martiny:" Correct. Your Honor."

96.    The Court: "There was one hearing at that point?"

97.    Det. Martiny:"Yes."

98.    The Court: "All right, just one moment."

99.    Mr. Rankin: "Do you recall as to whose idea it was to go out to the scene? Was it yours or was it the district attorney's office."

100.    Det. Martiny: "I don't recall exactly who came up with the idea."

101.   Mr. Rankin: "When you went out to the location is when you had realized not only."

102.   The Court: "Counsel, forgive me. I am going to ask him a question."

103.   Mr. Rankin: "Yes, sure."

104.   The Court: "Sir, the D.A.'s office has a decision and they have to decide whether or not it is worth appealing. You get a judge who suppressed the gun, knocked it out. And without a gun

105.   I think you even understand that there is not going to be a gun case to go to trial."

106.   Det. Martiny: "Correct, Your Honor."

107.   The Court: "Okay. All right. So, would you have - - I mean does that sound correct to you that you would be calling up the appeal D.A.'s and say we better go back to the scene, or you think it was the other way around?"

108.   Det. Martiny: "Most likely the other way around."

109.   The Court: "I would think too. But continue, Mr. Rankin."

110.   Mr. Rankin: "Thank you, Your Honor. Detective, they contacted you and asked you to come out to the scene after the gun was suppressed, right?"

111.   Det. Martiny: "Most likely, yes."

112.   Mr. Rankin: When you get to the scene you inform them that - - well withdrawn" "what did you inform them of exactly when you got to the scene?"

113.    Det. Martiny:" I remembered discussing the testimony about the fence with them, and about the gap, the space between the fence."

114.    Mr. Rankin: "Okay, and what did you say to them when you were discussing that testimony about the space between the fence?"

115.    Det. Martiny: "I looked at the fence and then I realized that as I testified before that a person couldn't fit through there like I described and I was mistaken."

116.    The Court: "Well, you actually, lets call it what it was, when you testified before the original pretrial issue you are saying he is squeezing between that gap and that was your recollection. I trust, at the time you testified before the pretrial hearing correct?"

117.    Det. Martiny: "I don't think I used the word squeezed. I think the cross used the word squeezed. And motioned through there and I said yes."

118.    The Court: "So you are saying you realized then upon that revisit to the scene with the D.A.'s from the Appeals Bureau that you were just wrong, incorrect, in describing it that way in your original testimony, correct?"

119.    Det. Martiny:" Correct."

120.    The Court: "and you told those D.A.'s that?

121.    Det. Martiny: "Yes, that's what I said."

122.    The Court: "did you also realize you were wrong in your original testimony regarding the perpetrator walking towards you prior to squeezing in between the fence?"

123.    Det. Martiny: "I don't think that came up at that time."

124. The Court: "with the other District attorney's at the scene that did not come up?" Det. Martiny:" That didn't come up at the time", Court: but did at some point prior to this trial commencing, did you realize that you were also wrong about the perpetrator walking towards you and then subsequently going in-between the fence?"

125. Det. Martiny: "I believe that testimony when I was reviewing this case with the ADA here today."

126. The Court: "So that's when you that's when the conversations regarding the perpetrator walking towards you, you realized that was wrong as well, correct?" Det. Martiny:" correct.'

127. The Court: "and the part about the perpetrator walking towards you, you didn't get a chance to reveal to the prosecutors who went with you to the scene back in 2008?"

128. The Court: "You are saying, I think I heard you correct but let's just nail this down on the record, that didn't come up, that issue?"

129. Det. Martiny: "I don't remember that issue coming up."

130. The Court: "You don't remember that issue coming up?" How did –fast forward to 2011, how did you realize that the perpetrator didn't walk towards you now in 2011 when you didn't realize it back in 2008?"

132. Det. Martiny: "I was presented with my testimony I read through it thoroughly just like it was another part in there where I said 109 Avenue when it was 109 Road. So I was mistaken about that. I reviewed my testimony, Your Honor."

133.   The Court: "Let me cut to the chase. When you read through it now in preparation for this trial, well, let me back up. I assume, I hope, that in your final testimony now at this trial you are using your best recollection of what you remember happened at the time of the incident. Correct?"

134.   Det. Martiny: "Yes, Your Honor."

135.   The Court: "When you were reviewing your prior testimony in preparation for this trial and you compared that to your memory you said, no, this is still wrong, right?"

136.   Det. Martiny: "Yes."

137.   The Court: "In terms of him walking towards you?"

138.   Det. Martiny: "Yes."

139.   The Court: "you realized that was another instance where you had given incorrect testimony at an earlier time, correct?"

140.   Det. Martiny: "Yes."

141.   The Court: "All right I am not saying intentional."

142.   Det. Martiny: "Not intentional at al..."

143.   The Court: " I am not accusing you of anything, you are not, I know you feel like you are on trial right now but you are not."

144.   Det. Martiny: "of course."

145.   The Court: "You are not on trial. I am just trying to get to the facts here."

27

146.   Mr. Rankin: "Yes, just a couple of last questions. Detective speaking about your memory is it your memory that you remember the person not walking towards you and going through the gate. Or is it the fact of seeing the space and realizing that that is an impossibility that is making you say that that's not what happened? Do you understand my question?"

147.   The Court: "You understand what counsel is asking you? Are you saying now that you—that you-are you like correcting your recollection of the events because upon going to the scene you are saying, no, whatever I think happened couldn't have happened that way? Or are you generally thinking back and just realizing that you were mistaken that you actually remember, truly remember, the way it was and that it couldn't be as you described in the prior testimony? They are two different things. In other words are you fitting your testimony, tailoring your testimony to fit the realities of what is physically possible; or is your testimony truly based on your recollection from the time of the incident?"

148.   Det. Martiny: "It is based on my recollection from the incident, Your Honor. And also when I visited the scene that helped me remember this event."

149.   The Court: "What counsel is asking you quite pointedly is this, are you now changing your testimony because you are saying whatever you think you remembered just couldn't have happened. Or do you truly remember it now the way you are testifying at trial?"

150.   Det. Martiny: "I remember it now as it happened that day."

151.   The Court: "And you are not changing it to fit the realities of what you saw when you visited the scene first shortly after the original hearing and in the weeks right before this trial?"

152.   Det. Martiny: "No, I am not changing it to do that, Your Honor, at all."

The Court:" I think that's the point you are trying to make."

153.   Mr. Rankin: "Yes. And I have one last question to ask, if you had never got the call from District Attorney's Office and visited the scene, would your testimony today have been…"

154.   Mr. Kanellopoulous: "I don't think that's relevant."

155.   Mr. Rankin: "That answers the question fully. If you never got the call and visited the scene would your memory have been when you testified already that he walked towards you and squeezed through the fence?"

156.   The Court: "This is the point. Your present recollection that he never walked towards you, you are telling me, Detective, is based upon your thinking further about what actually did occur at the time of the incident correct?"

157.   Det. Martiny: "Yes, Your Honor."

158.   The Court: "All right. Now, the point of the matter is this. Is that testimony influenced in any way by the fact that you visited the scene back in 2008 as well as now three years later, is that a factor in you apparently changing your testimony about him walking towards you?"

159.   Det. Martiny: "The walking towards me wasn't brought up at that time when I went with the _ ."

160.    The Court:" Yes. Does that have anything to do with your on-site inspections of the scene back in 2008 and just a couple of weeks ago?"

161.    Det. Martiny: "No, that's from me reviewing my testimony."

162.    Prosecutors knowingly and willfully withheld exculpatory evidence from The appellate court, defense, trial court and jury.

163.    On November 28, 20011, outside of the presence of the jury, but on the record, the following conversation transpired, Mr. Kanellopoulous: "Judge - - that's not actually accurate. This detective went to the scene with our chief executive Jack Ryan, as well as Ed Saslaw who handled the appeal in this case. And at that point it was clear- - actually it was right after the hearing he was mistaken, because it is almost impossibility unless you weigh 10 pounds to fit through the fence and  ..."

164.    The Court: "You – excuse me for interrupting. So you weren't there when he went to the scene, correct? Is that what you are saying?"

165.    Mr. Kanellopoulous: "No, I never went with this detective to the scene."

166.    The Court: "I don't care about that. Okay. But, was the fact that he was mistaken in his pretrial suppression hearing testimony on that particular issue about the perpetrator squeezing between that area  next to the fence, was that fact indeed, as the witness testified, was that - - is that correct that that fact was brought to your attention?"

167.    Mr. Kannellopoulous: "Yes. When I prepped him I went over his hearing testimony and he told me, yes."

168.    The Court: "Okay. This is what I am asking you. So did you bring that discrepancy to defense counsel's attention?"

169.    Mr. Kanellopoulous: "I did not. I assumed that we had already discussed that. I am the third ADA on this case."

170.    Mr. Rankin: "First off, it appears that the detective in this case had, back in 2008, realized that his testimony at his hearing in regard to this case was inaccurate."

171.    The Court: Back when? In 2008?"

172.    Mr. Rankin: "2008. After suppression but before the D. A.'S Office appealed. He informed - - apparently no this District Attorney, he informed apparently an appellate attorney that works with the Queen D.A.'s Office as well as a supervising ADA that what I testified to previously was wrong."

173.    The Court: "Can I stop you for a second?"

174.    Mr. Rankin: "Yes."

175.    The Court: "How do you know that?"

176.    Mr. Rankin: "I know that from conversations with the Assistant District Attorney."

177.    The Court: "In the Appellate Bureau?"

178.    Mr. Rankin: "No."

179.    The Court: "This assistant?"

180.    Mr. Rankin: "This District Attorney sitting right here."

181.    The Court: "I'll have you respond to that in a minute. Keep going Counselor."

182.    Mr. Rankin: "The part he learned the information was incorrect was a fact that A. the perpetrator came down the steps towards the police officer and then slid in between the fence and the staircase. He went to the location realized that that was an impossibility and informed, the Queens District Attorney's Office. The Queens District Attorney's office chose to suppress that information. They did not alert the Appellate Division, yet they appealed. They did not alert my client's attorney, yet they pressed forward. The appellate Division is making their decision, their issue was on standing. Part of standing, as you know, is the issue of intentional abandonment versus abandonment based on an illegal approach. One of the reasons the Appellate Division came to the conclusion it was intentional abandonment was because he came to the police officer and then made a conscious choice to go back the other way, the side of the fence.."

183.    The Court "Hold your thought."

184.    The Court: "Yes. Mr. Rankin argues - - Mr. Rankin argues that when the people are in possession of information that their witness - - at least a twofold obligation. Which was to let the defense know and also let the appellate court know so that the appellate court not rests their decision on any erroneous information. Now, you argue that this would have been immaterial to the decision by the appellate division second department? You argue that there is no obligation on the People to let the defense know when they learn that a witness had given incorrect information at a pretrial proceeding? Okay? I am not prepared to agree with you that that is the law. Okay? And I just - - I would suggest to you, People, that the best practice on

32

this, okay, if not the required state of the law, would have been to do those two things, for you or appellate counsel for the D.A.'s Office Appeals Bureau to let the defense know, look, our witness was just incorrect at the suppression hearing. Perhaps let the Appellate Division know. Perhaps then the Appellate Division, like one of the arguments you made, Mr. Rankin, would have said, we are going to remand this back and reopen the hearing because we want a correct set of acts to decide this case before you ask us to make our determination. So I don't really get that, People. That you just should not have turned that information over to either the defense or also, not necessarily in that order, let the appellate court know."

185.    On November 28, 20011, outside of the presence of the jury, but on the record, the following conversation transpired:

186.    ADA Kanellopoulous: admits on the record that Det. Martiny went to the scene with chief executive Jack Ryan, as well as Ed Saslaw who handled the appeal in this case. And at that point it was clear, actually it was right after the hearing he was mistaken, because it is almost impossibility unless you weigh 10 pounds to fit through the fence.

187.    The Court asked ADA Kanellopoulous if whether the fact that Det. Martiny was mistaken in his pretrial suppression hearing testimony on that particular issue about the perpetrator squeezing between that area next to the fence, was that fact as the witness testified, correct that that fact was brought to ADA Kanellopoulous' attention, at which time ADA. Kannellopoulous, said "Yes. When I prepped him I went over his hearing testimony and he told me, yes."

187.   The Court asked ADA Kanellopoulous whether he brought the discrepancy to defense counsel's attention and ADA Kanellopoulous stated "I did not. I assumed that we had already discussed that. I am the third ADA on this case."

188.   Defense Counsel stated that he was informed by ADA Kanellopoulous that it appeared that Det. Martiny back in 2008, realized that his testimony at his hearing in regard to this case was inaccurate, after the suppression but before the D. A.'S Office appealed. And that Det. Martiny told an appellate attorney that works with the Queen D.A.'s Office as well as a supervising ADA that what Det. Martiny testified to previously was wrong."

189.   Defense counsel went on to state. "The part he learned the information was incorrect was a fact that A, the perpetrator came down the steps towards the police officer and then slid in between the fence and the staircase. He went to the location realized that that was an impossibility and informed, the Queens District Attorney's Office. The Queens District Attorney's office chose to suppress that information. They did not alert the Appellate Division, yet they appealed. They did not alert my client's attorney, yet they pressed forward.

The appellate Division is making their decision, their issue was on standing. Part of standing, as you know, is the issue of intentional abandonment versus abandonment based on an illegal approach. One of the reasons the Appellate Division came to the conclusion it was intentional abandonment was because he came to the police officer and then made a conscious choice to go back the other way, the side of the fence- -"

190.   The Court then stated: "Mr. Rankin (defense counsel) argues that when the people are in possession of information that their witness - - at least a twofold obligation. Which was to let the defense know and also let the appellate court know so that the appellate court not

rests their decision on any erroneous information. Now, you argue that this would have been immaterial to the decision by the appellate division second department? You argue that there is no obligation on the People to let the defense know when they learn that a witness had given incorrect information at a pretrial proceeding? Okay? I am not prepared to agree with you that that is the law. Okay? And I just -- I would suggest to you, People, that the best practice on this, okay, if not the required state of the law, would have been to do those two things, for you or appellate counsel for the D.A.'s Office Appeals Bureau to let the defense know, look, our witness was just incorrect at the suppression hearing. Perhaps let the Appellate Division know. Perhaps then the Appellate Division, like one of the arguments you made, Mr. Rankin, would have said, we are going to remand this back and reopen the hearing because we want a correct set of acts to decide this case before you ask us to make our determination. So I don't really get that, People. That you just should not have turned that information over to either the defense or also, not necessarily in that order, let the appellate court know.

191.    It is clear from this record that Jack Ryan, a chief executive assistant district attorney and assistant district attorney Ed Saslaw had full knowledge that Det. Martiny had given false testimony during the suppression hearing, yet both ADAs, chose to cover up that information in order to continue in their malicious prosecution crusade against Deon Davis.

192.    Thereafter, ADA Saslaw, filed an appeal with the Appellate Division, Second Department in an attempt to have the trial court's ruling to suppress all evidence recovered by Det. Martiny suppressed, reversed. ADA Saslaw intentionally attached Det. Martiny's false testimony from the suppression hearing as part of the record to intentionally mislead the Appellate Division and to obtain a reversal by any means necessary. ADA Ryan and ADA Saslaw not only chose to conceal this exculpatory information from the Appellate Division, but

also from the curt and trial attorney, thereby violating Mr. Davis' right to due process. The record also shows that the trial judge agreed that this new evidence was exculpatory in nature and that the district attorney's office had a legal obligation to inform defense as well s the Appellate Division.

193.    Trial judge gives Judicial Notice to jury as a consequence of the Queens District Attorney's Office having concealed exculpatory evidence from the defense.

194.    On December 2, 2011 the trial court stated the following on the record, "Before Detective Martiny re-takes the stand. I am going to take judicial notice of the following state of facts. This is based on things that - - these are based on developments that took place at this trial that were outside of your presence, okay but these were things that I have determined you should know as the tier of fact in this case. So I am going to state to you the following: Based on what took place outside of your presence at this trial, it is relevant to your determination. You will consider what I say, this being information just like all evidence in this case that you may consider in making a determination at this trial. Detective Martiny, as we know, testified at a pre-trial hearing on October 1, 2008. He testified at that hearing in relevant detail that the perpetrator walked down the steps towards him, faced him before reaching down to his waist and pulling out a firearm. He also testified that then the perpetrator squeezed through the fence and the staircase. Shortly after the hearing was concluded and again that was the hearing that took place on October 1, 2008, shortly after the hearing was concluded and sometime soon after the date of October 22, 2008, Detective Martiny visited the scene of the incident along with Assistant District Attorneys from the Queens District Attorney's Office. Upon visiting the scene at that time, he realized that his testimony was in error as to these details and he told this to the Assistant District Attorneys who were present. I am further stating to you that this information

was not revealed to the defense or the Court until November 30, 2011 outside the presence of the jury after defense counsel had commenced cross-examination of the witness who's on the witness stand presently. You may consider all of that."

195.   This record evidences the Queens County District Attorney's willingness to do "anything necessary" in order to obtain a conviction. As prosecutors, the Queens District Attorney's Office is well aware of their ongoing obligation to timely disclose of all material evidence favorable to the defense pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1983), <u>Giglo v. United States</u>, 406 U.S. 150 (1972), and their progeny and the Due Process and Fair Trial Clause of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Yet, this office knowingly and willfully withheld exculpatory evidence from the defense in order to conceal the fact that their only witness to this alleged crime, Det. Martiny, had repeatedly given false testimony under oath.

196.   <u>Det. Martiny is repeatedly caught giving false testimony on cross examination in his failed attempt to cover up the fact that his arrest of Deon Davis was based solely upon racial profiling</u>

197.   Mr. Rankin: "Now while you were running or maybe after you ran, at some point you put out a description, correct?"

198.   Det. Martiny: "I did broadcast the transmission. I don't know the exact contents whether I put it over the radio but I did inform other officers."

199.   Mr. Rankin: "But what you informed them of, you informed them of a description over the radio, did you not?"

200.    Det. Martiny: "Yes, I did."

201.    Mr. Rankin: "And would it be fair to say that the description that you informed them over the radio was male black, black hoodie; would that be fair to say that was the extent of the description that you put over the radio back on November 1, 2007?"

202.    Det. Martiny: "I don't know if I put that description over."

203.    Mr. Rankin: "Would anything help to refresh your recollection?"

204.    The Court: "Look at the first line on this document, detective, the very first line on this document at the top and let us know if that refreshes your recollection as to the details that you provided in your description put over the radio, specifically male black. black hoodie."

205.    Det. Martiny: "I assisted in that description, your honor."

206.    The Court: "You did?"

207.    Det. Martiny: "I don't know if I transmitted over the radio."

208.    The Court: "But that came from you, from your observations, correct?"

209.    Det. Martiny:  "Correct."

210.    The Court: "That was put over the radio, correct?"

211.    Det. Martiny: "Yes."

212.    The Court: "Go ahead."

213.    Mr. Rankin: "One step further. I understand that you say you assisted. Didn't you, in fact actually transmit over the radio that description?"

214.    Det. Martiny: "I said it to you before I don't know if I did."

215.    Mr. Rankin: "You are not sure if you did that, okay. And the description we're talking about male black, black hoodie, correct?"

216.    Det. Martiny: "Yes."

217.    Mr. Rankin: "Do you remember testifying back on October 1, 2008, page 35 line 3", Question: At any point did you ever give a description of my client to another officer to assist in your pursuit? Answer: I believe I made a radio transmission. Question: You made a radio transmission? Answer: I believe I did. Question: Did you give a description of the individual that you saw carrying a gun? Answer: Yes."

218.    Mr. Rankin: "Do you remember being asked that question and giving that answer under oath on October 1, 2008?"

219.    Det. Martiny: "Yes I did."

220.    Mr. Rankin: "So to the best of your recollection you testified under oath that you gave a radio transmission description, correct?"

221.    Det. Martiny: "What I said there is I believe I did."

222.    Mr. Rankin: "And you have no reason to believe now that you didn't right?"

223.    Det. Martiny: "Yes."

224.    Mr. Rankin: "So you did say that you saw the perpetrator's facial features before you lost sight of him did you not?"

225.    Det. Martiny: "Yes, Yes."

226.    Mr. Rankin: "All right. and that would have been the time that you are stating that you saw his facial features during the time on the staircase and then the time during the pursuit right?"

227.    Det. Martiny: "Yes."

228.    Mr. Rankin: "Okay that would have been before the radio transmission right?"

229.    Det. Martiny: "How can I convey to other people over the radio what this gentleman's face look like?"

230.    The Court: "Sir, if there was a description relevant to facial features that you could communicate, okay, you do agree that that's capable of being put over the radio if there is something distinctive about a person's face?"

231.    Det. Martiny: "Yes, if there is a scar, if there is a bruise or he is bleeding, yes."

232.    Mr. Rankin: "You would agree, male black, is not a description; would you agree with that?"

233.    Det. Martiny: "Um, I think it is part of a description."

234.    Mr. Rankin: "I am going to ask it one more time so you can thicken about it. you agree, male black, is not a description, right?"

235.     Mr. Kanellopoulous: "Objection."

236.     The Court: "Counsel, that's argumentative. Male black, that identifies the gender of the person and the race of the person. At least the skin tone of the person would be more accurate. I suppose. Go ahead."

237.     Mr. Rankin: "There are some black people with different skin tones right? Black is not a skin tone is it?"

238.     The Court: "This is true."

239.     Det. Martiny: "Yes it is different skin tones for people."

240.     Mr. Rankin: "Dark skinned blacks like Michael Jordan and light skinned blacks like me right? Yu wouldn't confuse me with Michael Jordan would you?"

241.     Mr. Kanellopoulous: "Objection, Judge."

242.     The Court: "Objection overruled. The point being there could be a variety of complexions which would fit into male black; light skin, dark skin, medium skin tones; correct sir?"

243.     Det. Martiny: "Yes."

244.     Mr. Rankin: "You didn't communicate any of the skin tones, right?"

245.     Det. Martiny: "No I didn't."

246.     Mr. Rankin: "You saw the skin tone of the perpetrator right, back on November 1. 2007 right?"

247.    Det. Martiny: "I saw his face."

248.    Mr. Rankin: "What skin tone is he?"

249.    Det. Martiny: "He is a black male."

250.    Mr. Rankin:  "Wow. what skin tone is he?"

251.    The Court:  "You are saying of the defendant seated in the courtroom?"

252.    Mr. Rankin: "Yes, what skin tone is my client?"

253.    The Court: "How would you describe the defendant's skin tone as he sits here today?"

254.    Det. Martiny: "Medium."

255.    Mr. Rankin: "Did you put that over the radio?"

256.    Det. Martiny: "No, No I didn't."

2567.    Mr. Rankin: "You saw the perpetrator's hairstyle because the hoodie was down, as you said, on the date of November 1, 2007 right?"

258.    Det. Martiny: "Did I know his hairstyle?"

259.    Mr. Rankin: "Did you see the perpetrator's hairstyle?"

260.    Det. Martiny: "I don't' recall looking at the hairstyle."

261.    Mr. Rankin: "You were looking at his face right? You could not see his hair, could you not?"

262.    Det. Martiny: "Yeah, I don't recall the type of hairstyle he had that day."

263.    Mr. Rankin: "Did you see hair on the perpetrator's head do you recall or not recall?"

264.    Det. Martiny: "Yes."

265.    Mr. Rankin: "Is there any way you could describe it?"

266.    Det. Martiny: "I wouldn't be able to do that."

267.    Mr. Rankin: "How about body size? did you see the perpetrator's body size?"

268.    Det. Martiny: "Yes."

269.    Mr. Rankin: "Okay, did you give a description of body size?"

270.    Det. Martiny: "No."

271.    Mr. Rankin: "Why not?"

272.    Det. Martiny: "It just wasn't done at that time."

273.    Mr. Rankin: "Did you see a description of the perpetrator's clothing?"

274.    Det. Martiny: "Yes."

275.    Mr. Rankin: "In fact you indicated when we came in the following day the prosecutor asked you some extra questions and you talked about this pocket in this jean that seemed important to you right?"

276.    Det. Martiny: "Yes it did."

277.    Mr. Rankin: "And you would have seen that before you made your radio communication right?"

278.    Det. Martiny: "Yes."

279.    Mr. Rankin: "Did you communicate that over the radio?"

280.    Det. Martiny: "No I didn't."

281.    Mr. Rankin: "Did you take a photograph of the pocket that you felt was important in terms of your identification?"

282.    Det. Martiny: "No I didn't."

283.    Mr. Rankin: "Why not?"

284.    Det. Martiny: "I recognized the defendant upon his face, that was good enough for me. I recognized the defendant in this case by his face and the clothing he wore that day when he was carrying the gun. The pants were distinctive to me also because he had embroidery on the pocket. Is that the answer to your question?"

285.    Mr. Rankin: "Yes."

286.    Mr. Rankin: "Now lets talk about the time you get to the that red dot that is indicated on that diagram. That would have been when you say that you saw my client with these other officers?"

287.    Det. Martiny: "Yes."

288.    Mr. Rankin: "And your testimony before this jury was that after you received the radio transmission that you went over to the location where the red dot was in approximately two minutes correct?"

289.    Det. Martiny: "Yes."

290.    Mr. Rankin: "So, you would have went over there and made the identification of my client sometime around 12:35, 12:33 in that vicinity right?"

291.    Det. Martiny: "Yes."

292.    Mr. Rankin: "And that would have been when you went over, saw my client and placed cuffs on him correct?"

293.    Det. Martiny: "Yes."

294.    Mr. Rankin: "And he would have been under arrest at that moment correct?"

295.    Det. Martiny: "Technically, yes."

296.    Mr. Rankin: "And terminology for arrest in police speak is, one under, correct?"

297.    Det. Martiny: "Yes."

298.    Mr. Rankin: "And yet the memo book that you filled out close in time to the incident of November, I am sorry, of November 1, 2007, you wrote in that memo book, one under, at 1:25 a.m. did you not?"

299.    Det. Martiny: "Yes, I did."

300.   Mr. Rankin: "And in your on-line booking sheet that your prepared and reviewed and that your supervisor reviewed you put the arrest time as 1:25 a.m. at the location of 110 and Sutphin, did you not?"

301.   Det. Martiny: "Yes."

302.   Mr. Rankin: "And, in fact nowhere in any police paperwork do you indicate that you arrested my client at any time other than 1:25 a.m. correct?"

303.   Det. Martiny: "Correct."

304.   Mr. Rankin: " And the time that you are telling this jury that you placed my client under arrest is around 12:35 a.m.; isn't that correct?"

305.   Det. Martiny: "Yes."

306.   Mr. Rankin: "But there is no police paperwork to back up at all; am I correct?"

307.   Det. Martiny: "Yes."

308.   Mr. Rankin: "Now, Detective, you mentioned that, actually, withdrawn. You also told ADA Mercado, who is a District Attorney in the Queens D.A.'s Office; is that correct?"

309.   Det. Martiny: "Yes."

310.   The Court: "You also did what?"

311.   Mr. Rankin: "Told ADA Mercado."

312.   The Court: "What?"

46

313.   Mr. Rankin: "Actually withdrawn. Do you know who ADA Mercado is?"

314.   Det. Martiny: "Yes."

315.   Mr. Rankin: "And sometime after November 1, 2007 you spoke with her before you went and testified in the grand jury; is that correct?"

316.   Det. Martiny: "Yes."

317.   Mr. Rankin: "And when you spoke with her you told her that you identified my client on November 1, 2007 at 1:25 a.m. at 110 and Sutphin Boulevard; did you not tell her that?"

318.   Det. Martiny: "I don't know what time I told her I arrested, the paperwork was at 1:25."

319.   The Court: "Lets just clearly answer counsel's question. Did you tell that Assistant District Attorney  that your identification took place at 1:25 a.m.?"

Det. Martiny: "I don't recall."

320.   Mr. Rankin: "You don't recall making that statement to her?"

Det. Martiny: "No."

321.   Mr. Rankin:  "Okay. And is it your testimony that in this case the identification and the arrest pretty much occurred simultaneously?"

322.   Det. Martiny: "No. I didn't say that."

323.   Mr. Rankin:  "I am asking you, is that your testimony?"

324.   Det. Martiny: "Today?"

325.   Mr. Rankin: "You agree that you pulled up to 110 and Sutphin Boulevard, you saw my client, you say, with several police officers, you walked up to him, you saw him and you put cuffs on him, correct?"

326.   Det. Martiny: "Yes."

327.   Mr. Rankin: "Would you not agree that there was identification by you and a subsequent arrest by you simultaneously; would you not agree with that?"

328.   The Court: "Or we could use another word, recognition, and that right after that you took charge of him?"

329.   Det. Martiny: "Yes, Yes."

330.   The Court: "Correct?"

331.   Det. Martiny: "Yes, Your Honor."

332.   Mr. Rankin: "Okay. So when you wrote in your memo book 1:25 a.m. arrest, that was in your handwriting right?"

333.   Det. Martiny: "Yes, it was."

334.   Mr. Rankin: "And you just stated to this jury that your identification and arrest, recognition and arrest were simultaneous, correct?"

335.   Det. Martiny: "I don't think that that's the ways it happened. The way it happened was once I went to the scene I put the handcuffs on the defendant, brought him back

and we had a continuing on investigation as I described earlier. That wasn't concluded until 1:25 a.m."

336.    The Court: "You already told us about that. But you did take charge of him much earlier?"

337.    Det. Martiny: "Yes."

338.    The Court: "It could have been anywhere 12:30, 12:35 a.m., correct?"

339.    Det. Martiny: "Yes."

340.    Mr. Rankin: "You did write 1:25 a.m. in your memo book and you did review the official on-line booking sheet regarding the arrest time and location and agreed with it being 110, Sutphin at 1:25 a.m.; did you not?"

341.    Det. Martiny: "To me 1:25 was the arrest rime."

342.    Mr. Rankin: "And Detective, you would agree that there is a discrepancy between your paperwork, that being the memo book and your on-line booking sheet, as to the time you made your observation at 110 and Sutphin; you would agree with that, right?"

343.    Det. Martiny: "No."

344.    Mr. Rankin: "You would not agree with that?"

345.    Det. Martiny: "No."

346.    Mr. Rankin: "Are you certain you would not agree that there is a discrepancy?"

49

347.    Mr. Kanellopoulous: "Objection."

348.    The Court: "No, this is probing. Objection overruled."

349.    Mr. Rankin:  No?"

350.    Det. Martiny: "No."

351.    Mr. Rankin: "Okay. Do you remember testifying back on November 28, 2011 outside the presence of this jury, do you remember being asked this question and giving this answer, page 96: Question: You agree there is a discrepancy in your paperwork, the memo book, the on-line booking sheet, as to the time you made the observation at 110 and Sutphin?" Answer: Yes."

352.    Mr. Kanellopoulous: "I am going to object, Judge."

353.    Mr. Rankin: "Do you remember being asked that question and giving that that answer?"

354.    The Court: "Objection overruled."

355.    Mr. Rankin: "Do you remember being asked that outside of the presence of the jury and agreeing that there was a discrepancy in your paperwork between the memo book and the on-line booking sheet as to the time you made the observation at 110 and Sutphin; do you remember saying that?"

356.    The Court: "Did you so testify at that pretrial hearing on that date?"

357.    Det. Martiny: "Yes, I did."

358.    Mr. Rankin: "Did you say what I just read to you?"

359.    Det. Martiny: "Is that what it says?"

360.    Mr. Rankin: "You can take a look at it if you want."

361.    Det. Martiny: "Yes, Please."

362.    The Court: "If it is there that way in the transcript and this attorney is an officer of the court."

363.    Mr. Rankin: "I ask the - -"

364.    The Court: "Is that what you said if it is in the transcript?"

365.    Det. Martiny: "Yes."

366.    Mr. Rankin: "I ask the attorney stipulate."

367.    The Court: "You are stipulating?"

368.    Mr. Kanellopoulous: "I am."

369.    Mr. Rankin: "Why are you saying now in front of the jury there was no discrepancy between your paperwork and what your observation really was?"

370.    Mr. Kanellopoulous: "Objection, Judge."

371.    The Court: "No, objection overruled. I do not need to step in. Sir, okay, lets not get trapped by words or terminology. Insofar as your paperwork might - - insofar as there

is a time of 1:30 as the time where you next saw the defendant and insofar as that time is - -
would be relevant to time that you took charge of him, you are saying that's

not true. Okay? You took charge of him sometime, you saw him, you recognized him sometime
between 12:30 and 12:35 a.m., correct?"

372.    Det. Martiny: "Yes."

373.    The Court: "Okay. So that is a discrepancy. So if we take your paperwork to say,
well, the time you did that was 1:30, that is not correct. You have given reasons why

there is that difference in time, we are not talking about that. But the time when you laid eyes on
him for the next time after losing sight of him was 12:30 to 12:35, not

1:30. You understand?"

374.    Det. Martiny: "Yes, I understand, Your Honor."

375.    The Court: "What was that time? 1:30? I don't want to misstate the record, what is
in the paperwork?"

376.    Mr. Rankin: "In terms of time of arrest, 1:25."

377.    The Court: "Forgive me. I thought I slightly misstated. Thank you. He agrees that
is a discrepancy. Okay."

378.    Mr. Rankin: "Okay. Now, I would like to talk about your pursuit a little bit again
just as to one point, Detective. You seemed to indicate that after you lose sight of the

perpetrator at the steps when he jumps over the fence that you see him again, I believe it would be 110 Avenue; is that correct?"

379.   Det. Martiny: "Yes, I do."

380.   Mr. Rankin: "And now you remember testifying back on October 1, 2008, you remember being asked this question and giving this answer. This is page six.

Question: And what did you do after you made that observation? Line ten. Answer: I recovered the gun and the defendant hopped over the fence. Question: Did you lose sight of the defendant, officer? Answer: Yes. Question: And about a minute or two later did you come to see him again? Answer: Yes. Question: And where was that? Answer: It was on Sutphin Boulevard and 110th Avenue. "Mr. Rankin: "Do you remember being asked that question and giving that answer on October 1, 2008?"

381.   Det. Martiny: "I do."

382.   Mr. Rankin: "So in this sworn testimony October 1, 2008 you made no mention in regard to seeing the perpetrator before you got to 110 and Sutphin, at 110 and 153 Street; isn't that correct?"

383.   Det. Martiny: "It wasn't asked."

384.   Mr. Rankin: "You weren't asked. So you were not alerted to give that answer when the question of: And what did you do after you made that observation. And the question did you - - I'll read it again. Question: And what did you do after you made the observation? Answer: I recovered the gun, defendant hopped over the fence.

Question: Did you lose sight of the defendant, officer? Answer: Yes. Question: And about a minute or two later did you come to see him again?

385.    Mr.Rankin: "Officer, that didn't alert you to the fact that you could have said, I saw him again"

386.    Mr. Kanellopoulous: "Objection, Judge."

387.    The Court: "No, I'll actually allow it."

388.    Mr. Rankin: "You understand you didn't volunteer at that point that, wait, hold up, there was some interim sighting of him between those times?"

389.    Det. Martiny: "I didn't alert anyone to that."

390.    Mr. Rankin: "But as you testified before this jury you are indicating now that you saw him again before you were at 110 and Sutphin, correct?"

391.    Det. Martiny:  "I wasn't asked that question in the hearing. So I didn't answer it."

392.    Mr. Rankin: "Okay, Detective. And you say that that sighting at 110 and 153 street was from approximately three houses away, correct?"

393.    Det. Martiny: "Approximately."

394.    Mr. Rankin: "Using this courtroom, how far would you say that would be?"

395.    The Court: "Well, all right, lets try to make it simple for you. Would it be as far back as the rear of my courtroom or not that far?"

396.    Det. Martiny: " It would be a little further than that."

397.    Mr. Rankin: "Do you have measurement for your wall, judge?"

398.    The Court: "For the record that is more than 35 to 40 feet away."

399.    Mr. Rankin: "Okay. If you had to approximate if this were 35, 40 feet, how much more than 35 to 40 feet would you say that your observation was made from?"

400.    Det. Martiny: "I would be comfortable saying, your Honor that it is more than the width of this courtroom. I don't know after that. "

401.    The Court: "That's the best he is going to offer you."

402.    Mr. Rankin: "When you say, width, do you mean from where you are sitting to that wall back here?"

403.    The Court: "From the wall behind the Judge's bench to the rear wall of my courtroom."

404.    Mr. Rankin: "Could you estimate if it was half the distance further?"

405.    The Court : "Actually I should say to the front wall of my courtroom. Okay."

406.    Mr. Rankin: "Can you state that it was half the distance further or double the distance, any way to make a determination?"

407.    Det. Martiny: "Like I said before, I wouldn't feel comfortable. I would say at least the width of this courtroom."

408.    The Court: "Well, okay, width, we will actually call that length."

409.    Det. Martiny: "I am sorry, length."

410.    Mr. Rankin: "And it being nighttime you will agree you were not able to see the perpetrator's face from that distance, right?"

411.    Det. Martiny: "No I wasn't."

412.    Mr. Rankin: "Would it be fair to say all you could really see, being that it was nighttime, was the outline of the perpetrator's clothing, would that be fair to say?"

413.    Det. Martiny: "No."

414.    Mr. Rankin: "Okay, what would be fair to say?"

415.    Det. Martiny: "I saw the perpetrator's clothing."

416.    Mr. Rankin: "You couldn't tell the color of the clothing from that distance at nighttime, could you?"

417.    Det. Martiny: "I saw the perpetrator's clothing. What he was wearing, male black wearing a hoodie and blue jeans."

418.    Mr. Rankin: "And that's all you were able to see from that distance correct?"

419.    Det. Martiny: "Yes."

420.    Det. Martiny is repeatedly caught giving false testimony on cross examination in his failed attempt to cover up the fact that his arrest of Deon Davis was based solely upon racial profiling

421.    Mr. Rankin: "Now while you were running or maybe after you ran, at some point you put out a description, correct?"

422.    Det. Martiny: "I did broadcast the transmission. I don't know the exact contents whether I put it over the radio but I did inform other officers."

423.    Mr. Rankin: "But what you informed them of, you informed them of a description over the radio, did you not?"

424.    Det. Martiny: "Yes, I did."

425.    Mr. Rankin: "And would it be fair to say that the description that you informed them over the radio was male black, black hoodie; would that be fair to say that was the extent of the description that you put over the radio back on November 1, 2007?"

426.    Det. Martiny: "I don't know if I put that description over."

427.    Mr. Rankin: "Would anything help to refresh your recollection?"

428.    The Court: "Look at the first line on this document, detective, the very first line on this document at the top and let us know if that refreshes your recollection as to the details that you provided in your description put over the radio, specifically male black, black hoodie."

429.    Det. Martiny: "I assisted in that description, your honor."

430.    The Court: "You did?"

431.    Det. Martiny: "I don't know if I transmitted over the radio."

432.    The Court: "But that came from you, from your observations, correct?"

433.    Det. Martiny:  "Correct."

434.    The Court: "That was put over the radio, correct?"

435.   Det. Martiny: "Yes."

436.   The Court: "Go ahead."

437.   Mr. Rankin: "One step further. I understand that you say you assisted. Didn't you, in fact actually transmit over the radio that description?"

438.   Det. Martiny: "I said it to you before I don't know if I did."

439.   Mr. Rankin: "You are not sure if you did that, okay. And the description we're talking about male black, black hoodie, correct?"

440.   Det. Martiny: "Yes."

441.   Mr. Rankin: "Do you remember testifying back on October 1, 2008, page 35 line 3", Question: At any point did you ever give a description of my client to another officer to assist in your pursuit? Answer: I believe I made a radio transmission. Question: You made a radio transmission? Answer: I believe I did. Question: Did you give a description of the individual that you saw carrying a gun? Answer: Yes."

442.   Mr. Rankin: "Do you remember being asked that question and giving that answer under oath on October 1, 2008?"

443.   Det. Martiny: "Yes I did."

444.   Mr. Rankin: "So to the best of your recollection you testified under oath that you gave a radio transmission description, correct?"

445.   Det. Martiny: "What I said there is I believe I did."

446.   Mr. Rankin: "And you have no reason to believe now that you didn't right?"

447.    Det. Martiny: "Yes."

448.    Mr. Rankin: "So you did say that you saw the perpetrator's facial features before you lost sight of him did you not?"

449.    Det. Martiny: "Yes, Yes."

450.    Mr. Rankin: "All right, and that would have been the time that you are stating that you saw his facial features during the time on the staircase and then the time during the pursuit right?"

451.    Det. Martiny: "Yes."

452.    Mr. Rankin: "Okay that would have been before the radio transmission right?"

453.    Det. Martiny: "How can I convey to other people over the radio what this gentleman's face look like?"

454.    The Court: "Sir, if there was a description relevant to facial features that you could communicate, okay, you do agree that that's capable of being put over the radio if there is something distinctive about a person's face?"

455.    Det. Martiny: "Yes, if there is a scar, if there is a bruise or he is bleeding, yes."

456.    Mr. Rankin: "You would agree, male black, is not a description; would you agree with that?"

457.    Det. Martiny: "Um, I think it is part of a description."

458.    Mr. Rankin: "I am going to ask it one more time so you can thicken about it, you agree, male black, is not a description, right?"

459.    Mr. Kanellopoulous: "Objection."

460.    The Court: "Counsel, that's argumentative. Male black, that identifies the gender of the person and the race of the person. At least the skin tone of the person would be more accurate. I suppose. Go ahead."

461.    Mr. Rankin: "There are some black people with different skin tones right? Black is not a skin tone is it?"

462.    The Court: "This is true."

463.    Det. Martiny: "Yes it is different skin tones for people."

464.    Mr. Rankin: "Dark skinned blacks like Michael Jordan and light skinned blacks like me right? Yu wouldn't confuse me with Michael Jordan would you?"

465.    Mr. Kanellopoulous: "Objection, Judge."

466.    The Court: "Objection overruled. The point being there could be a variety of complexions which would fit into male black; light skin, dark skin, medium skin tones; correct sir?"

467.    Det. Martiny: "Yes."

468.    Mr. Rankin: "You didn't communicate any of the skin tones, right?"

469.    Det. Martiny: "No I didn't."

470.  Mr. Rankin: "You saw the skin tone of the perpetrator right, back on November 1, 2007 right?"

471.  Det. Martiny: "I saw his face."

472.  Mr. Rankin: "What skin tone is he?"

473.  Det. Martiny: "He is a black male."

474.  Mr. Rankin: "Wow, what skin tone is he?"

475.  The Court: "You are saying of the defendant seated in the courtroom?"

476.  Mr. Rankin: "Yes, what skin tone is my client?"

477.  The Court: "How would you describe the defendant's skin tone as he sits here today?"

478.  Det. Martiny: "Medium."

479.  Mr. Rankin: "Did you put that over the radio?"

480.  Det. Martiny: "No, No I didn't."

481.  Mr. Rankin: "You saw the perpetrator's hairstyle because the hoodie was down, as you said, on the date of November 1, 2007 right?"

482.  Det. Martiny: "Did I know his hairstyle?"

483.  Mr. Rankin: "Did you see the perpetrator's hairstyle?"

484.  Det. Martiny: "I don't' recall looking at the hairstyle."

485.    Mr. Rankin: "You were looking at his face right? You could not see his hair, could you not?"

486.    Det. Martiny: "Yeah, I don't recall the type of hairstyle he had that day."

487.    Mr. Rankin: "Did you see hair on the perpetrator's head do you recall or not recall?"

488.    Det. Martiny: "Yes."

489.    Mr. Rankin: "Is there any way you could describe it?"

490.    Det. Martiny: "I wouldn't be able to do that."

491.    Mr. Rankin: "How about body size? did you see the perpetrator's body size?"

492.    Det. Martiny: "Yes."

493.    Mr. Rankin: "Okay, did you give a description of body size?"

494.    Det. Martiny: "No."

495.    Mr. Rankin: "Why not?"

496.    Det. Martiny: "It just wasn't done at that time."

497.    Mr. Rankin: "Did you see a description of the perpetrator's clothing?"

498.    Det. Martiny: "Yes."

499.    Mr. Rankin: "In fact you indicated when we came in the following day the prosecutor asked you some extra questions and you talked about this pocket in this jean that

seemed important to you right?"

500.    Det. Martiny: "Yes it did."

501.    Mr. Rankin: "And you would have saw that before you made your radio communication right?"

502.    Det. Martiny: "Yes."

503.    Mr. Rankin: "Did you communicate that over the radio?"

503.    Det. Martiny: "No I didn't."

504.    Mr. Rankin: "Did you take a photograph of the pocket that you felt was important in terms of your identification?"

505.    Det. Martiny: "No I didn't."

506.    Mr. Rankin: "Why not?"

507.    Det. Martiny: "I recognized the defendant upon his face, that was good enough for me. I recognized the defendant in this case by his face and the clothing he wore that day when he was carrying the gun. The pants were distinctive to me also because he had embroidery on the pocket. Is that the answer to your question?"

508.    Mr. Rankin: "Yes."

509.    Mr. Rankin: "Now lets talk about the time you get to the that red dot that is indicated on that diagram. That would have been when you say that you saw my client with these other officers?"

510.    Det. Martiny: "Yes."

501.    Mr. Rankin: "And your testimony before this jury was that after you received the radio transmission that you went over to the location where the red dot was in approximately two minutes correct?"

502.    Det. Martiny: "Yes."

503.    Mr. Rankin: "So, you would have went over there and made the identification of my client sometime around 12:35, 12:33 in that vicinity right?"

504.    Det. Martiny: "Yes."

505.    Mr. Rankin: "And that would have been when you went over, saw my client and placed cuffs on him correct?"

506.    Det. Martiny: "Yes."

507.    Mr. Rankin: "And he would have been under arrest at that moment correct?"

508.    Det. Martiny: "Technically, yes."

509.    Mr. Rankin: "And terminology for arrest in police speak is, one under, correct?"

510.    Det. Martiny: " Yes."

511.    Mr. Rankin: "And yet the memo book that you filled out close in time to the incident of November, I am sorry, of November 1, 2007, you wrote in that memo book, one under, at 1:25 a.m. did you not?"

512.    Det. Martiny: "Yes, I did."

513.    Mr. Rankin: "And in your on-line booking sheet that your prepared and reviewed and that your supervisor reviewed you put the arrest time as 1:25 a.m. at the location of 110 and Sutphin, did you not?"

513.    Det. Martiny: "Yes."

514.    Mr. Rankin: "And, in fact nowhere in any police paperwork do you indicate that you arrested my client at any time other than 1:25 a.m. correct?"

515.    Det. Martiny: "Correct."

516.    Mr. Rankin: " And the time that you are telling this jury that you placed my client under arrest is around 12:35 a.m.; isn't that correct?"

517.    Det. Martiny: "Yes."

518.    Mr. Rankin: "But there is no police paperwork to back up at all; am I correct?"

519.    Det. Martiny: "Yes."

520.    Mr. Rankin: "Now, Detective, you mentioned that, actually, withdrawn. You also told ADA Mercado, who is a District Attorney in the Queens D.A.'s Office; is that correct?"

521.    Det. Martiny: "Yes."

522.    The Court: "You also did what?"

523.    Mr. Rankin: "Told ADA Mercado."

524.    The Court: "What?"

525.    Mr. Rankin: "Actually withdrawn. Do you know who ADA Mercado is?"

526.    Det. Martiny: "Yes."

527.    Mr. Rankin: "And sometime after November 1, 2007 you spoke with her before you went and testified in the grand jury; is that correct?"

528.    Det. Martiny: "Yes."

529.    Mr. Rankin: "And when you spoke with her you told her that you identified my client on November 1, 2007 at 1:25 a.m. at 110 and Sutphin boulevard; did you not tell her that?"

530.    Det. Martiny: "I don't know what time I told her I arrested, the paperwork was at 1:25."

531.    The Court: "Lets just clearly answer counsel's question. Did you tell that Assistant District Attorney that your identification took place at 1:25 a.m.?"

532.    Det. Martiny: "I don't recall."

533.    Mr. Rankin: "You don't recall making that statement to her?"

534.    Det. Martiny: "No."

535.    Mr. Rankin: "Okay. And is it your testimony that in this case the identification and the arrest pretty much occurred simultaneously?"

536.    Det. Martiny: "No. I didn't say that."

537.   Mr. Rankin:  "I am asking you, is that your testimony?"

538.   Det. Martiny:  "Today?"

539.   Mr. Rankin:  "You agree that you pulled up to 110 and Sutphin Boulevard, you saw my client, you say, with several police officers, you walked up to him, you saw him and you put cuffs on him, correct?"

540.   Det. Martiny:  "Yes."

541.   Mr. Rankin:  "Would you not agree that there was identification by you and a subsequent arrest by you simultaneously; would you not agree with that?"

542.   The Court:  "Or we could use another word, recognition, and that right after that you took charge of him?"

543.   Det. Martiny:  "Yes, Yes."

545.   The Court:  "Correct?"

546.   Det. Martiny:  "Yes, Your Honor."

547.   Mr. Rankin:  "Okay. So when you wrote in your memo book 1:25 a.m. arrest, that was in your handwriting right?"

548.   Det. Martiny:  "Yes, it was."

549.   Mr. Rankin:  "And you just stated to this jury that your identification and arrest, recognition and arrest were simultaneous, correct?"

540.    Det. Martiny: "I don't think that that's the ways it happened. The way it happened was once I went to the scene I put the handcuffs on the defendant, brought him back and we had a continuing on investigation as I described earlier. That wasn't concluded until 1:25 a.m."

541.    The Court: "You already told us about that. But you did take charge of him much earlier?"

542.    Det. Martiny: "Yes."

543.    The Court: "It could have been anywhere 12:30, 12:35 a.m., correct?"

544.    Det. Martiny: "Yes."

545.    Mr. Rankin: "You did write 1:25 a.m. in your memo book and you did review the official on-line booking sheet regarding the arrest time and location and agreed with it being 110, Sutphin at 1:25 a.m.; did you not?"

546.    Det. Martiny: "To me 1:25 was the arrest rime."

547.    Mr. Rankin: "And Detective, you would agree that there is a discrepancy between your paperwork, that being the memo book and your on-line booking sheet, as to the time you made your observation at 110 and Sutphin; you would agree with that, right?"

548.    Det. Martiny: "No."

549.    Mr. Rankin: "You would not agree with that?"

550.    Det. Martiny: " No."

551.    Mr. Rankin: "Are you certain you would not agree that there is a discrepancy?"

552.    Mr. Kanellopoulous: "Objection."

553.    The Court: "No, this is probing. Objection overruled."

554.    Mr. Rankin:  No?"

555.    Det. Martiny: "No."

556.    Mr. Rankin: "Okay. Do you remember testifying back on November 28, 2011 outside the presence of this jury, do you remember being asked this question and giving this answer, page 96: Question: You agree there is a discrepancy in your paperwork, the memo book, the on-line booking sheet, as to the time you made the observation at 110 and Sutphin?" Answer: Yes."

557.    Mr. Kanellopoulous: "I am going to object, Judge."

558.    Mr. Rankin: "Do you remember being asked that question and giving that that answer?"

559.    The Court: "Objection overruled."

560.    Mr. Rankin: "Do you remember being asked that outside of the presence of the jury and agreeing that there was a discrepancy in your paperwork between the memo book and the on-line booking sheet as to the time you made the observation at 110 and Sutphin; do you remember saying that?"

561.    The Court: "Did you so testify at that pretrial hearing on that date?"

562.    Det. Martiny: "Yes, I did."

563.    Mr. Rankin: "Did you say what I just read to you?"

564.    Det. Martiny: "Is that what it says?"

565.    Mr. Rankin: "You can take a look at it if you want."

566.    Det. Martiny: "Yes, Please."

567.    The Court: "If it is there that way in the transcript and this attorney is an officer of the court."

568.    Mr. Rankin: "I ask the - -"

569.    The Court: "Is that what you said if it is in the transcript?"

570.    Det. Martiny: "Yes."

571.    Mr. Rankin: "I ask the attorney stipulate."

572.    The Court: "You are stipulating?"

573.    Mr. Kanellopoulous: "I am."

574.    Mr. Rankin: "Why are you saying now in front of the jury there was no discrepancy between your paperwork and what your observation really was?"

575.    Mr. Kanellopoulous: "Objection, Judge."

576.    The Court: "No, objection overruled. I do not need to step in. Sir, okay, lets not get trapped by words or terminology. Insofar as your paperwork might - - insofar as there

is a time of 1:30 as the time where you next saw the defendant and insofar as that time is - -

would be relevant to time that you took charge of him, you are saying that's

not true. Okay? You took charge of him sometime, you saw him, you recognized him sometime

between 12:30 and 12:35 a.m., correct?"

577.   Det. Martiny: "Yes."

578.   The Court: "Okay. So that is a discrepancy. So if we take your paperwork to say,

well, the time you did that was 1:30, that is not correct. You have given reasons why

there is that difference in time, we are not talking about that. But the time when you laid eyes on

him for the next time after losing sight of him was 12:30 to 12:35, not

1:30. You understand?"

579.   Det. Martiny: "Yes, I understand, Your Honor."

580.   The Court: "What was that time? 1:30? I don't want to misstate the record. what is

in the paperwork?"

581.   Mr. Rankin: "In terms of time of arrest, 1:25."

582.   The Court: "Forgive me. I thought I slightly misstated. Thank you. He agrees that

is a discrepancy. Okay."

583.   Mr. Rankin: "Okay. Now, I would like to talk about your pursuit a little bit again

just as to one point, Detective.  You seemed to indicate that after you lose sight of the

perpetrator at the steps when he jumps over the fence that you see him again, I believe it would be 110 Avenue; is that correct?"

584.    Det. Martiny: "Yes, I do."

585.    Mr. Rankin: "And now you remember testifying back on October 1, 2008, you remember being asked this question and giving this answer. This is page six.

586.    Question: And what did you do after you made that observation? Line ten. Answer: I recovered the gun and the defendant hopped over the fence. Question: Did you lose sight of the defendant, officer? Answer: Yes. Question: And about a minute or two later did you come to see him again? Answer: Yes. Question: And where was that? Answer: It was on Sutphin Boulevard and 110th Avenue. "

587.    Mr. Rankin:  "Do you remember being asked that question and giving that answer on October 1, 2008?"

588.    Det. Martiny: "I do."

589.    Mr. Rankin: "So in this sworn testimony October 1, 2008 you made no mention in regard to seeing the perpetrator before you got to 110 and Sutphin, at 110 and 153 Street; isn't that correct?"

590.    Det. Martiny: "It wasn't asked."

591.    Mr. Rankin: "You weren't asked. So you were not alerted to give that answer when the question of: And what did you do after you made that observation. And the

question did you  - - I'll read it again. Question: And what did you do after you made the observation? Answer: I recovered the gun, defendant hopped over the fence.

Question: Did you lose sight of the defendant, officer? Answer: Yes. Question: And about a minute or two later did you come to see him again?

592.    Mr.Rankin: "Officer, that didn't alert you to the fact that you could have said, I saw him again"

593.    Mr. Kanellopoulous: "Objection, Judge."

594.    The Court: "No, I'll actually allow it."

595.    Mr. Rankin: "You understand you didn't volunteer at that point that, wait, hold up, there was some interim sighting of him between those times?"

596.    Det. Martiny: "I didn't alert anyone to that."

597.    Mr. Rankin: "But as you testified before this jury you are indicating now that you saw him again before you were at 110 and Sutphin, correct?"

598.    Det. Martiny:  "I wasn't asked that question in the hearing. So I didn't answer it."

599.    Mr. Rankin: "Okay, Detective. And you say that that sighting at 110 and 153 street was from approximately three houses away, correct?"

600.    Det. Martiny: "Approximately."

601.    Mr. Rankin: "Using this courtroom, how far would you say that would be?"

602.    The Court: "Well, all right, lets try to make it simple for you. Would it be as far back as the rear of my courtroom or not that far?"

603.    Det. Martiny: "It would be a little further than that."

604.    Mr. Rankin: "Do you have measurement for your wall, judge?"

605.    The Court: "For the record that is more than 35 to 40 feet away."

606.    Mr. Rankin: "Okay. If you had to approximate if this were 35, 40 feet, how much more than 35 to 40 feet would you say that your observation was made from?"

607.    Det. Martiny: "I would be comfortable saying, your Honor that it is more than the width of this courtroom. I don't know after that. "

608.    The Court: "That's the best he is going to offer you."

609.    Mr. Rankin: "When you say, width, do you mean from where you are sitting to that wall back here?"

610.    The Court: "From the wall behind the Judge's bench to the rear wall of my courtroom."

611.    Mr. Rankin: "Could you estimate if it was half the distance further?"

612.    The Court : "Actually I should say to the front wall of my courtroom. Okay."

613.    Mr. Rankin: "Can you state that it was half the distance further or double the distance, any way to make a determination?"

614.    Det. Martiny: "Like I said before, I wouldn't feel comfortable. I would say at least the width of this courtroom."

615.    The Court: "Well, okay, width, we will actually call that length."

617.    Det. Martiny: "I am sorry, length."

618.    Mr. Rankin: "And it being nighttime you will agree you were not able to see the perpetrator's face from that distance, right?"

619.    Det. Martiny: "No I wasn't."

620.    Mr. Rankin: "Would it be fair to say all you could really see, being that it was nighttime, was the outline of the perpetrator's clothing, would that be fair to say?"

621.    Det. Martiny: "No."

622.    Mr. Rankin: "Okay, what would be fair to say?"

623.    Det. Martiny: "I saw the perpetrator's clothing."

624.    Mr. Rankin: "You couldn't tell the color of the clothing from that distance at nighttime, could you?"

625.    Det. Martiny: "I saw the perpetrator's clothing. What he was wearing, male black wearing a hoodie and blue jeans."

626.    Mr. Rankin: "And that's all you were able to see from that distance correct?"

627.    Det. Martiny: "Yes."

628.  **Det. Martiny has a history of committing false arrest, malicious prosecution and excessive force against New York City Civilians**

629.  Det. Martiny has a history of being sued for false arrest, malicious prosecution and excessive force.

630.  In 2005, during Martiny's assignment at the 32nd Precinct, in Harlem, he was sued for false arrest and malicious prosecution, which the City of New York settled on his behalf.

631.  Consequently, within four (4) months of the incident Martiny was transferred from the 32nd Precinct to the 103rd Precinct, in Queens.

632.  Thereafter, in 2008 Det. Martiny was again sued for false arrest, malicious prosecution and excessive force and again the City of New York settled on his behalf.

633.  Det. Martiny was transferred from the 103rd precinct approximately six (6) months after the incident.

634.  Det. Martiny has since been transferred to the 113th Precinct in Queens, where he currently has a civil rights lawsuit pending against him for excessive force.

635.  During the trial, when asked by the prosecution whether it was outrageous that he, Det. Martiny had been sued three (3) times, Martiny stated "I think it is", "people want to sue the City and make some money, I mean, police officers are an easy target."

636.   On cross examination,  Det. Martiny went on to testify, "That's my personal feeling. As far as the city, some people look at the city to get a pay check, you know, if they want to sue the city, sometimes has deep pockets."

637.   <u>Det. Asman's testimony as to her stop of Deon Davis on November 1, 2007 was total fabrication in an attempt to assist Det. Martiny in covering up his malicious prosecution of Deon Davis, as Det. Asman did not stop Deon Davis on the date in question</u>

638.   On direct examination during Mr. Davis' jury trial Det. Asman testified that on the night of October 31, 2007 into November 1, 2007, Det. Asman was assigned to the 113th precinct in Queens, New York, with the SNEU Unit. Det. Asman worked either the 4pm to 1am and/or 6pm to 2am shift. Det. Asman was a plain clothes police officer on the date of the alleged incident.

639.   Upon being asked what she did once she stopped this individual, Det. Asman stated "I went over to the 103 actually, I think I was on our frequency. We're not on the same division as the 103rd. The 113th, we are on the same division with the 105th Precinct. The 103rd is with the 107th, so we don't share radios."

640.   Det. Asman, stated, "I went over the radio and I asked if anybody was looking for a male that had been running at the area of 110th and Sutphin" and that this radio transmission was done at 12:30am. And that although no one responded, Det. Asman decided to switch over to the 103rd frequency, because "central had responded, you know, nobody had answered that they were looking for anybody. "

641.  Det. Asman testified that "She was going to probably ask the 103rd and I went over to listen to what was going on in the 103rd." Det. Asman testified that she switched over to listen not to transmit anything.

642.  Det. Asman testified that she did in fact make a radio transmission to the 103rd, and a few minutes later two or three plain clothes officers from the 103rd came and took the individual away. Det. Asman testified that she had never seen the male officer that took the individual prior to that moment and did not see that officer again until the summer of 2009, at the 113th detective squad.

643.  Det. Asman testified that she spoke to no one about the stop of the individual on November 1, 2007, until two weeks prior to her appearing at the trial to testify. Det. Asman stated that she spoke to the prosecutor, Mr. Kanellopoulos.

644.  Det. Asman admitted to having created no paperwork reflecting the stop of the individual that she made on November 1, 2007. Det. Asman's reason for not creating paperwork, "He was not under arrest by myself nor was he, you know, released, you know, and walked away from us. If we would have stopped him and he would have been let go then I would have prepared paperwork, but that was not the case."

645.  On cross examination Det. Asman admitted that she had no idea who Deon Davis was, nor could she identify the defendant sitting at the defense table. Det. Asman admitted she did not know his name and she had no idea if he had anything to do with the October 31, 2007 incident.

646.  When asked by defense counsel if she even knew if this was the person she had stopped, Det. Asman replied, "No. " Det. Asman had no recollection of any facial features of the

individual she stopped on the night in question, nor did Det. Asman have any recollection as to clothing, height or weight.

647.    When asked by defense counsel if the only thing she recollected was that the individual she stopped was black and male, Det. Asman replied, "That's correct"."

648.    Det. Asman initially testified that while on the phone with Assistant District Attorney, Kanellopoulous two weeks earlier, she told him that the person she stopped she had given over to Det. Martiny.

649.    However, when asked by defense counsel when did she specifically identity Det. Martiny as the officer she had turned the defendant over to, Det. Asman admitted " He (Assistant District Attorney Kanellopoulous) actually told me that Detective Martiny now was the arresting officer."

650.    Defense Counsel then asked Det. Asman if she realized that Det. Martiny was the person she had turned the individual over to before she spoke to the ADA Kanellopoulous, Det. Asman, responded "um, yeah, yeah."

651.    Defense Counsel asked Det. Asman whether she had previously testified before the jury that she realized that Det. Martiny was the person she turned the individual over to in 2009 on direct examination. Det. Asman replied, "Yes." Asked whether that was two years before speaking with ADA Kanellopoulous, Det. Asman replied "Yes."

652.    Det. Asman testified that she could not recall the specific time of day it was regarding the events of October 31, 2007 going into November 1, 2007. Det. Asman further

testified that she only recalled that it was nighttime and during her tour of either 6pm to 2am or 4:30pm to 1:00 am.

653.    When asked by defense counsel if it would have been correct and proper protocol to have written down that a stop and frisk was performed on October 31, 2007 and put in her memo book, Det. Asman replied, "Yes".   However, Det. Asman admitted that although it was proper protocol, she didn't believe she would have written it in there. When asked if she should be following protocol, Det. Asman replied, "Yes", but also stated, "I did not."

654.    The judge then inquired further, asking Det. Asman if she believed there was an entry in her memo book. Det. Asman replied "I don't believe there's an entry." Det. Asman admitting she went against protocol. stated "because my involvement with it was so minimal. I felt at the time that I did not, you know, document it."

655.    Defense Counsel then asked Det. Asman even though police protocol would call for her to do so? Det. Asman replied "Yes."

656.    Det. Asman's memo book was missing at the time of trial.

657.    Det. Asman testified that she saw an individual running, but did not see him committing a crime, or any violation of laws. When asked by defense counsel whether running was a negative thing in her eyes, Det. Asman responded "It would depend on each time I would see it occur." Then asked if she saw any kids outside, being that it was hollowed night,

658.    Det. Asman testified that she did not remember seeing any. Det. Asman described Sutphin Blvd as mixed, with residential and commercial, with mostly storefronts. Det. Asman

agreed that 110th street is different because it has more houses. Det. Asman also agreed that Sutphin Boulevard has delis and stores and that these places are usually open at night.

659.    Det. Asman admitted that although the individual that she saw running wasn't doing anything, she decided to follow him anyway. When defense counsel asked why? Det. Asman replied, "we wanted to stop him to ask him was he okay. Who's he running from. you know, he's running very fast."

660.    Det. Asman testified that this is something she does all the time. When asked by defense counsel whether every time she sees a young person running does she stop them as a matter of police procedure? Det. Asman replied "sometimes."

661.    When asked why? Det. Asman replied " Was the time of night it was, you know." At which time defense counsel reminded Det. Asman that she had previously testified that she had no recollection of what time the incident occurred. Det. Asman replied, "It was dark outside", at which time defense counsel asked Det. Asman whether it gets dark fairly early in November. Det. Asman replied, "Yes, it does, yeah."

662.    When asked by defense counsel if she wanted to revise her answer as to the fact of the time of night being a factor in why she stopped the individual running, Det. Asman replied, "It was dark outside. I don't recall there being other people around. He was running." Defense Counsel again asked Det. Asman if some young person running at 6pm in the evening is a reason to stop someone. Det. Asman replied, "Yes, sometimes, yeah" and when asked why? Det. Asman replied, "If it's not obvious where they're running to or from, yes."

## NATURE OF DAVIS' INJURIES AND DAMAGES

663.    (a)Suffered approximately four (4) years of constraints to his liberty in having to make over 100 court appearance with the threat of incarceration for failure to appear;

664.    (b) was publicly shamed, disgraced and humiliated and saw his academic career paced on hold for four years;

665.    (c) suffered and continues to suffer great emotional and mental pain and anguish;

666.    (d) suffered loss of earnings and permanent impairment of earning power;

667.    (e) had to pay, substantial attorney fees and related legal expenses in connection with defending against criminal charges.

## AS AND FOR A FIRST CAUSE OFACTION

### (MALICIOUS PROSECUTION 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT MARTINY)

668.    That the Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through " 667" of the complaint with the same force and effect as if fully set forth herein.

669.    MARTINY knowingly swore to a false criminal court complaint initiating the criminal prosecution of PLAINTIFF.

670.   MARTINY Manufactured, or caused to be manufactured, false, unreliable

an/or misleading "evidence" intending it to be used by the prosecution in determining whether to

initiate criminal proceedings against PLAINTIFF, which "evidence" was used; MARTINY,

knowingly, willfully and/or with deliberate indifference to Plaintiff's constitutional rights , gave

false testimony under oath in the grand jury, suppression hearing and at trial.

671.   By virtue of the foregoing, MARTINY, with actual malice, initiated and

continued or caused the initiation and continuance of, criminal proceedings against PLAINTIFF

for which he knew or should have known there was no probable cause and for which in fact there

was no probable cause and thereby caused PLAINTIFF to be deprived of his liberty.

672.   Such proceeding ultimately was terminated in PLAINTIFF'S' favor.

673.   Additionally, MARTINY knew, but withheld from the grand jury, trial

judge, jury and defense either permanently or for a substantial period of time, exculpatory or

impeachment evidence that tended to negate PLAITNFIF'S' guilt and which he knew or should

have known the law required him to timely disclose. This evidence included but was not limited

to MARTINY'S having provided false testimony under oath during grand jury proceeding,

suppression hearing and jury trial.

674.   The aforementioned conduct which MARTINY committed, operated to

deprive PLAINTIFF of his rights under the constitution and laws of the United States.

(a)Not be indicted and prosecuted upon false, fabricated, manufactured,

misleading or inherently unreliable "evidence" including statements, documents, and testimony and ;

(b) Not be deprived of his liberty absent probable cause to believe he has committed a crime in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

( c) To timely disclose of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1983), Giglo v. United States, 406 U.S. 150 (1972), and their progeny and the Due Process and Fair Trial Clause of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

675.    The foregoing violations of PLAITNITFF'S' federal constitutional rights by MARTINY substantially, proximately, and foreseeably caused the initiation and continuation of PLAINTIFF'S' criminal prosecution, loss of liberty and other injuries and damages.

676.    The foregoing violations of PLAINTIF'S' rights amounted to Constitutional torts and within the scope of MARTINY'S employment and authority.

677.    MARTINY committed the foregoing violations of PLAINTIFF'S rights knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to PLAINTIFF'S constitutional rights or to the effect of such misconduct upon PLAINTIFF'S constitutional rights.

678.    By reason of the foregoing MARTINY is liable to PLAINTIFF, pursuant to 42

U.S.C. section 1983, for compensatory and for punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (MALICIOUS PROSECUTION 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT ASMAN)

679. That the Plaintiff repeats and re-alleges the allegations contained in Paragraphs "1" through "678" of the complaint with the same force and effect as if fully set forth herein.

680. ASMAN Manufactured, or caused to be manufactured, false, unreliable an/or misleading "evidence" intending it to be used by the prosecution in determining whether to initiate criminal proceedings against PLAINTIFF, which "evidence" was used;

681. ASMAN, knowingly, willfully and/or with deliberate indifference to PLAINTIFF'S constitutional rights gave false testimony under oath at the suppression hearing and at trial.

682. By virtue of the foregoing, ASMAN, with actual malice, initiated and continued or caused the initiation and continuance of, criminal proceedings against PLAINTIFF for which she knew or should have known there was no probable cause and for which in fact there was no probable cause and thereby caused PLAINTIFF to be deprived of his liberty.

683. Such proceeding ultimately was terminated in PLAINTIFF'S' favor.

684. Additionally, ASMAN knew, but withheld from the trial judge, jury and defense

either permanently or for a substantial period of time, exculpatory or impeachment evidence that tended to negate PLAITNFIF'S' guilt and which she knew or should have known the law required her to timely disclose. This evidence included but was not limited to ASMAN having provided false testimony under oath during suppression hearing and jury trial.

685.    The aforementioned conduct which ASMAN committed, operated to deprive PLAINTIFF of his rights under the constitution and laws of the United States

> (a) Not be prosecuted upon false, fabricated, manufactured, misleading or inherently unreliable "evidence" including statements, documents, and testimony and ;

> (b) Not be deprived of his liberty absent probable cause to believe he has committed a crime in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

> ( c) To timely disclose of all material evidence favorable to the defense pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1983), <u>Giglo v. United States</u>, 406 U.S. 150 (1972), and their progeny and the Due Process and Fair Trial Clause of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

686.    The foregoing violations of PLAITNITFF'S' federal constitutional rights by ASMAN substantially, proximately, and foreseeably caused the initiation and continuation of PLAINTIFF'S' criminal prosecution, loss of liberty and other injuries and damages.

687.    The foregoing violations of PLAINTIF'S' rights amounted to Constitutional torts and within the scope of ASMAN'S employment and authority.

688.    ASMAN committed the foregoing violations of PLAINTIFF'S rights knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to PLAINTIF'S constitutional rights or to the effect of such misconduct upon PLAINTIFF'S constitutional rights.

689.    By reason of the foregoing ASMAN is liable to PLAINTIFF, pursuant to 42 U.S.C. section 1983, for compensatory and for punitive damages.

## AS AND FOR A THIRD CASUE OFA CTION
## (MALICIOUS PROSECUTION 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANTS RYAN, SASLAW, MERCADO AND KANELLOPOULOUS)

690.    That the Plaintiff repeats and re-alleges the allegations contained in Paragraphs **"1"** through **" 689"** of the complaint with the same force and effect as if fully set forth herein.

691.    Defendants RYAN, SASLAW, MERCADO AND KANELLOPOULOUS caused to be manufactured, false, unreliable and/or misleading "evidence" intending it to be used by the prosecution in determining whether to initiate criminal proceedings against PLAINTIFF, which "evidence" was used;  RYAN, SASLAW, MERCADO AND KANELLOPOULOUS knowingly, willfully and/or with deliberate indifference to PLAINTIFF'S constitutional rights , allowed witnesses to give false testimony under oath at trial.

692.   By virtue of the foregoing, RYAN, SASLAW, MERCADO AND

KANELLOPOULOUS , with actual malice, initiated and continued or caused the initiation and

continuance of, criminal proceedings against PLAINTIFF for which they knew or should have

known there was no probable cause and for which in fact there was no probable cause and

thereby caused PLAINTIFF to be deprived of his liberty.

693.   Such proceeding ultimately was terminated in PLAINTIFF'S' favor.

694.   Additionally, RYAN, SASLAW, MERCADO AND KANELLOPOULOUS

knew, but withheld from the trial judge, jury and defense either permanently or for a substantial

period of time, exculpatory or impeachment evidence that tended to negate PLAITNFIF'S' guilt

and which they knew or should have known the law required them to timely disclose. This

evidence included but was not limited to MARTINY and ASMAN having provided false

testimony under oath during suppression hearing and jury trial.

695.   The aforementioned conduct which RYAN, SASLAW, MERCADO AND

KANELLOPOULOUS  committed, operated to deprive PLAINTIFF of his rights under the

constitution and laws of the United States

(a) Not be prosecuted upon false, fabricated, manufactured, misleading or

inherently unreliable "evidence" including statements, documents, and testimony

and ;

(b) Not be deprived of his liberty absent probable cause to believe he has

committed a crime in violation of his rights under the Fourth and Fourteenth

Amendments to the United States Constitution; and

( c) To timely disclose of all material evidence favorable to the defense pursuant

to Brady v. Maryland, 373 U.S. 83 (1983), Giglo v. United States, 406 U.S. 150

(1972), and their progeny and the Due Process and Fair Trial Clause of the Fifth.

Sixth and Fourteenth Amendments to the United States Constitution.

696.    The foregoing violations of PLAITNITFF'S' federal constitutional rights by

RYAN. SASLAW, MERCADO AND KANELLOPOULOUS substantially, proximately, and

foreseeably caused the initiation and continuation of PLAINTIFF'S' criminal prosecution, loss of

liberty and other injuries and damages.

697.    The foregoing violations of PLAINTIF'S' rights amounted to Constitutional

torts and within the scope of RYAN, SASLAW, MERCADO AND KANELLOPOULOUS`

employment and authority.

698.    RYAN, SASLAW, MERCADO AND KANELLOPOULOUS committed the

foregoing violations of PLAINTIFF'S' rights knowingly, intentionally, willfully, recklessly

and/or with deliberate indifference to PLAINTIF'S constitutional rights or to the effect of such

misconduct upon PLAINTIFF'S constitutional rights.

699.    By reason of the foregoing RYAN, SASLAW, MERCADO AND

KANELLOPOULOUS is liable to PLAINTIFF , pursuant to

42 U.S.C. section 1983, for compensatory and for punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE CIVIL RIGHTS 42. U.S.C. § 1983 CLAIM AGAINST

### DEFENDANTS RYAN, SASLAW, MERCADO AND KANELLOPOULOUS)

700.    That the Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "699" of the complaint with the same force and effect as if fully set forth herein.

701.    Defendants RYAN, SASLAW and MERCADO knowing the malicious prosecution against PLAINTIFF had evaporated, Defendants RYAN, SASLAW and MERCADO acting in the capacity of investigators acted in concert and conspired with MARTNY, to use any means, no matter how unconstitutional or coercive, to have the trial court's order suppressing all evidence in the case against PLAINTIFF reversed, in order to continue their malicious prosecution against PLAINIFF these unconstitutional means included, but were not limited to:

> (a) abusing judicial process by repeatedly misrepresenting to the court and defense on numerous court appearances over a span of one year that the QDAO would be in fact dismissing all criminal charges against PLAINTIFF.

> (b) Abusing judicial process by intentionally allowing a representative from QCDA to personally attest to "facts" which QCDA knew were untrue in order to deceive the court into adjourning the case repeatedly for the production of the dismissal memo, with full knowledge that no such memo existed and that QCDA would be appealing the court's decision as to suppression of all evidence.

702.    In that throughout the period of conspiracy, the defendants pursued their objectives with actual malice toward PLAINTIFF, with utter and deliberate indifference to and

disregard for PLAINTIFF'S rights under the constitution and laws of the United States, and without probable or reasonable cause to believe PLAINTIFF was guilty of any crime.

703.    Pursuant to the Conspiracy, Defendants RYAN, SASLAW and MERCADO and their co-conspirators and accomplices, named and unnamed, knowingly, intentionally, maliciously, and/or with deliberate indifference to the constitutional rights of PLAINTIFF did:

704.    Knowingly used defendant MARTINY'S false testimony given at the suppression hearing, with Defendant MARTINY'S full knowledge, as part of the record in the QDAO's appeal of the trial court's October 22, 2008 suppressing all evidence recovered by Defendant MARTINY in PLAINTIFF'S criminal case.

> (a) Defendants RYAN, SASLAW and MERCADO in concert with Defendant MARTINY did knowingly incorporate into the record, false, misleading or inherently unreliable "evidence" manufactured, fabricated or created, for the purpose of using such "evidence" against PLAINTIFF in an attempt to have the trial court's decision overturned by the Appellate Division Second Department.

705.    The aforesaid conduct of Defendants RYAN, SASLAW, MERCADO and MARTINY operated, inter alia, to deprive PLAINTIFF of his rights under the Constitution and the laws of the Untied States:

706.    To timely disclose to the appropriate authorities

and/or to PLAINTIFF of all evidence favorable to PLAINTIFF, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to <u>Brady v. Maryland</u>, 373 U.S. 3 (1963), and its progeny;

707.    Pursuant to the due process clause of the fifth and fourteenth amendment to the United States Constitution, not have false, misleading or inherently unreliable "evidence" manufactured, fabricated or created, for the purpose of using such " against PLAINTIFF.

708.    By reason of the foregoing Defendants are liable to PLAINTIFF pursuant to 42 U.S.C. section 1983, for compensatory and for punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## (MONELL 42 U.S.C. § 1983 CLAIM AGAINST
## DEFENDANT CITY for the actions of the NYPD)

709.    That the Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "708" of the complaint with the same force and effect as if fully set forth herein.

710.    The foregoing violations of PLAINTIFFS' federal constitutional rights and injuries were further, directly, foreseeably, proximately and substantially caused by the conduct, chargeable to Defendant CITY, amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIF, who are prosecuted for alleged criminal activities.

711.    Prior to PLAINTIFF'S prosecution, policymaking officials at the NYPD, with

deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision and discipline concerning:

(a) The determination of probable cause to make an arrest;

(b) the continuing duty of police officers to provide truthful testimony

712.   The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the fair to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant CITY, including, but not limited to the New York City Police Commissioner, who knew (or should have known):

a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the prosecution of criminal cases;

b) that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instructi·n, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations as well s the incentives that police employees have to make the wrong choice; and

c) that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

713. The aforementioned policy making officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

a) credible allegations, many substantiated by judicial decisions finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony (see Exhibit " " appended hereto and incorporated herein by reference, listing some of those decisions).

b) civil lawsuits some of which resulted in substantial civil settlements credibly alleging that police had falsified, exaggerated, or withheld material evidence (see Exhibit " " appended hereto and incorporated heron by reference, listing some of those lawsuits)

c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals and the New York Appellate Division, discussing the difficult issues that regularly arise under Brady as well as the probable cause requirement of the Fourth Amendment;

d) Judicial decisions directly criticizing the NYPD for failing to rain and supervise officers in their Brady obligations and for failing to adopt adequate *Brady* disclosure polices, see Carter v. Harrison, 612 F Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to

disclose evidence that favors criminal defendants under *Brady*, see Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992), and Carter v. Harrison, supra;

e) formal reports of the N..Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other rem :dial action; and

f) the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions;

714.    Under the principle of municipal liability for federal civil rights violations, the CITY"S Police Commissioner KELLY (or his authorized delegates) has final responsibility for training, instructing, supervision and disciplining police personnel with respect to the prosecution of criminal matters, including constitutional requirements governing the initiation of criminal prosecution and the disclosure of Brady material.

715.    Police Commissioner, KELLY personally and/or though his authorized delegates, at all relevant times had final authority and constitute a City Policymaker for whom the CITY is liable, with respect to compliance by NYPD employees with above mentioned constitutional requirements.

716.    During all times material to this complaint, Police Commissioner KELLY owed a duty to the public at large and to PLAINTIFF, which he knowingly and intentionally breached, or to which he was deliberate y indifferent, to implement policies, procedures,

customs, practices, training and discipline to prevent or deter conduct by his subordinates

violating the aforementioned constitutional rights of criminal suspects or defendants and of other

members of the public.

717. The aforementioned policies, procedures, regulations, practices and/or

customs of Defendant CITY and the NYPD were collectively and individually a substantial

factor in bringing about the aforesaid violations by the individual Police Defendants of

PLAINTIF'S rights under the constitution and laws of the United States.

718. By virtue of the foregoing Defendant CITY is liable for having

substantially caused the foregoing violations of PLAINTIFF'S' constitutional rights and his

constitutional injuries.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## (MONELL 42 U.S.C. § 1983 CLAIM AGAINST
## DEFENDANT CITY for the actions of the QDAO)

719. That the Plaintiff repeats and re-alleges the allegations contained in

paragraphs "1" through "718" of the complaint with the same force and effect as if fully set

forth herein.

720. At the time of PLAINTIFF'S prosecution, and continuing until the jury's

acquittal., District Attorney BROWN, as the manager and chief administrator of the QDAO, a

city agency, maintained a policy, custom and/or practice of deliberate indifference to violations

by his employees of the constitutional rights of individuals who were criminally prosecuted in

Queens County, including but not limited to, abuse of process, manufacturing of false evidence and Brady violations, reliance on false or misleading evidence and argument at trial ("the policy") and covering up the same.

721.    The policy began with his induction as District Attorney and has continued to this day.

722.    The policy permits, encourages, or acquiesces in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors and NYPD detectives working with the D.A.'s Office, particularly in serious cases where arrest and conviction is most desired by the office. The policy led directly to the violations of PLAINTIFF'S' constitutional rights by the subsequent cover up of police and prosecutors' wrongdoing, before and during PLAINTIFF" trial and which prolonged PLAINTIFF'S malicious prosecution and other damages.

723.    More specifically, it was the policy of BROWN to tolerate (and thereby encourage) violations of his Officer's constitutional obligation to make timely disclosures to the defense or exculpatory or impeachment information known as *Brady* material. His deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue including in PLAINTIFF'S case.

724.    While prosecutors were told in  theory to comply with their *Brady*

obligation, they were not told there would be consequences to them if they failed to, and in fact there was none.

725. BROWN had no employee handbook, manual or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

726. Despite numerous court decisions finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under Brady, Rosario or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury and/or defense, none of the prosecutors were disciplined.

727. The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately and substantially caused by conduct chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the QDAO, namely:

(a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i. the duty not to use false, misleading or

unreliable testimony during criminal proceedings, including suppression hearings and tri

ii.    the continuing obligation to correct false, inaccurate, inaccurate or incomplete or misleading evidence, testimony whenever such misconduct is discovered;

iii.    the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions of all material evidence or information favorable to a person suspected or accused of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses.

(b) the failure to adequately instruct, train, supervise and discipline their employees with respect to such matters.

728.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the

Defendant CITY, including but not limited to the District Attorney of Queens County and his delegates, who knew:

> (a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the prosecution of criminal cases;

> (b)    that such issues either present employees with different choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentive that employees have to make the wrong choice; and

> (c )    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

729.    During all times material to this Complaint, the CITY through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

730.   By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.


## DAMAGES DEMAND


**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

731.   For Compensatory damages of not less than $1 million;

732.   For Punitive damages against the individual defendants of $2 million

733.   For reasonable attorney's fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

734.   For pre-judgment interest as allowed by law; and

735.   For such other and further relief as this Court may deem just and proper.


Dated: Brooklyn, New York

January 23, 2011


Respectfully submitted,


TRACEY A. GRANT, ESQ.

Attorney I.D. tg2143

26 Court Street-Suite 714

Brooklyn, New York 11242

(718) 858-3000 (Phone)

(718) 858-9615 (Fax)

Email: Gra462@aol.com

*Attorney for the Plaintiff*

TO: Corporation Counsel of the City of New York

100 Church Street

New York, New York 10007

*Attorneys for Defendant*

City of New York