UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

DEON DAVIS

                                        Plaintiff,

                                                                **AMENDED**
                                                                **COMPLAINT**

            -against-                                           **12-CV-312 (KAM)(VVP)**

RONALD MARTINY, as a member of the New                          **JURY TRIAL**
                                                                **DEMANDED**

York City Police Department and individually,


                                        Defendants.

----------------------------------------------------------------------X


        Plaintiff, Deon Davis, by and through his counsel, Tracey A. Grant, Esq. alleges the

following facts and causes of action against the above-captioned Defendant:



                            **NATURE OF ACTION**



1.       This is a civil action pursuant to 42 U.S.C. §§1983 and 1988 seeking monetary

damages for Plaintiff, DEON DAVIS, due to his malicious prosecution cause by the pervasive

misconduct of Defendant Det. Martiny.

2.      Plaintiff was acquitted of all charges by a jury of his peers on December 19, 2011, despite evidence that the key witness for the prosecution, a New York City Police Officer fabricated testimony in order to continue the malicious prosecution of Plaintiff; that the prosecutors in the Office of Queens District Attorney Richard Brown  had knowingly relied on this arresting officer's false testimony at the suppression hearing and trial and had knowingly suppressed exculpatory and impeachment evidence.

## JURISDICTION AND VENUE

3.      This action arises under 42 U.S.C. §§1983 and 1988.

4.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

6.      Plaintiff Deon Davis is a natural person, who, at all times mentioned herein, resided in Queens County, New York.

.7.      At all times mentioned herein, Defendant RONALD MARTINY ("MARTINY") was at all relevant times a police officer employed by the New York City Police Department assigned to the 103rd Precinct in the county of Queens, and is named here in his official and individual capacities. At all times material to this Complaint, Defendant MARTINY acted toward Plaintiff under color of the statutes, ordinances, customs and usage of the State of New

2

York, City of New York and the New York City Police Department, and within the scope of his employment.

## STATEMENT OF FACTS

8.     On Halloween, October 31, 2007, Plaintiff Deon Davis an African-American male, was 17 year old, living at home with his parents in Queens, New York.  Plaintiff was a senior in high school and worked part-time for the school newspaper and as a tutor.

9.     On said date at approximately 10:30 p.m. Mr. Davis was standing on a public sidewalk, near an acquaintance's home on 110th and Brinkoff Avenue, while speaking to his cousin on his cellular phone. Mr. Davis was informed by his female cousin that she needed his assistance back at his aunt's house because a few females were harassing her. Mr. Davis immediately began hurrying down the street, while still on his cellular phone with his cousin traveling towards his aunt's house at 111th and 146th Street, Queens, New York.

10.     Immediately thereafter, Mr. Davis saw a dark colored car speeding by him, which stopped as Mr. Davis looked back at the car. Mr. Davis realized it was the police once the window came down and the driver, stated "Stop" at which time Mr. Davis took a few steps back. The driver, a white male, wearing a police shield, plain clothes and a police vest, exited the vehicle. The officer asked Mr. Davis  "What are you doing over here?" during which Mr. Davis explained what had transpired on the cell phone and where he was headed.

11.     The officer frisked Mr. Davis and requested identification at which time Mr. Davis provided a school identification card.  Upon reviewing the identification, the officer,

whose partner, a male white, wearing plain clothes, had also exited the vehicle. Mr. Davis was told by the officer that frisked him in sum and substance "you have to wait my sergeant is coming over for identification." Approximately 10-15 minutes later, an unmarked police vehicle pulled up and a white male, wearing plain clothes and a police shield exited the vehicle. Said officer asked the other officers if Mr. Davis had been searched, after which this officer stated in sum and substance, "search him again and handcuff him."

12.    Mr. Davis was searched again and handcuffed. The officer recovered nothing from Mr. Davis' person during both searches. Mr. Davis asked why he was being arrested but none of the officers responded.  The officer, who instructed that he, Mr. Davis be searched and handcuffed, placed Mr. Davis in an unmarked vehicle and proceeded to drive Mr. Davis to another location, which Mr. Davis later learned to be 109-25 153 Street, Queens, New York. Mr. Davis later learned this officer to be Det. Martiny.

13.    Mr. Davis, still handcuffed, was left in the vehicle as Det. Martiny exited the vehicle. Mr. Davis heard a helicopter and observed dogs as he sat in the back of the police car. Mr. Davis estimated being at this location for approximately 30 to 50 minutes, after which time, Officer Martiny and another officer in plain clothes entered the vehicle and proceeded to drive off. Officer Martiny stated to Mr. Davis, while in the backseat, "Do you have any drugs because we are not narcotics", Mr. Davis told the officers that he was not in possession of any drugs.  Mr. Davis was wearing a black snorkel jacket, with a navy blue hoodie underneath and blue jeans.

14.    Mr. Davis was taken to the 103rd Precinct, where he was photographed and fingerprinted. Mr. Davis was instructed to remove his snorkel jacket and to keep on his hoodie while his photograph was taken. Mr. Davis' mother was present at the precinct but was not

allowed to speak to her. Mr. Davis was kept at the precinct in a holding cell for approximately 1 hour after which he was taken to central booking. Upon arriving at central booking Mr. Davis was photographed and again instructed by a Det. O'Donnell to remove his snorkel jacket, while his hoodie remained on. Mr. Davis remained at Queens Central Booking for approximately 15-17 hours, until he was arraigned. During the arraignment the prosecution requested bail in the amount of $100,000. Mr. Davis was represented by a court appointed attorney and his family appeared in court for emotional support.

15.    The Judge released Mr. Davis on his own recognizance and Mr. Davis' case was adjourned for grand jury action. At no time was Mr. Davis in possession of a gun or marijuana, as all charges were fabricated by the arresting officer, Martiny based upon racial profiling.  Det. Martiny at no time observed Mr. Davis in possession of a gun or marijuana, such there was no probable cause to arrest Mr. Davis nor to continue in the prosecution of Mr. Davis. At no time on October 31, 2007 into November 1, 2007 was Mr. Davis at 109-25 153 Street, Queens, New York at said location, except for when he was taken there by Officer Martiny, while in handcuffs.

16.    Mr. Davis was charged with criminal possession of a weapon and unlawful possession of marijuana based upon fabricated police paperwork drafted by Martiny and an accusatory instrument sworn to by Officer Martiny, which was based on allegations Det. Martiny knew to be false. Mr. Davis was subsequently indicted based upon the fabricated testimony of Det. Martiny, who was the prosecution's key witness.

17.    Mr. Davis retained legal counsel and approximately one year after Mr. Davis' arrest, a suppression hearing was held on October 1, 2008. During the suppression hearing

Det. Martiny gave fabricated testimony as to his observation of Mr. Davis having been in possession of a gun on the night of October 31, 2007 into November 1, 2007. Det. Asman also gave fabricated testimony surrounding her stop of Mr. Davis on the night in question. On or about October 22, 2008 the trial court ruled that all evidence was suppressed.

18.     Thereafter, prosecutors at Queens County District Attorney's Office proceeded to mislead the court and Mr. Davis for approximately one year, by stating on the record repeatedly that a dismissal of all charges against Mr. Davis was forthcoming.  On a date subsequent to the trial court's suppression ruling ADAs Jack Ryan, Ed Saslaw and Ana Mercado traveled to 109-25 153 Street, the scene of the alleged incident in question.  These ADA's went to this location in an investigative capacity to obtain information as to the circumstances surrounding the events of the alleged incident.

19.     These ADAs contacted Officer Martiny and requested that he meet them at the location as well. During this investigative trip to the scene of the alleged incident, Det. Martiny informed these ADAs that he had provided false testimony during the suppression hearing. Upon receiving this information, these ADAs chose to conceal this exculpatory evidence from the defense as well as the Appellate Division.  The Queens County District Attorney's Office filed an appeal as to the suppression of all the evidence in Mr. Davis' case. However, the Queens County District Attorney's Office did attach Det. Martiny's false testimony from the suppression hearing as part of the record in their appeal to the Appellate Division, Second Department.

20.     On November 1, 2010 the Appellate Division reversed the trial court's decision and the case proceeded to trial approximately 1 year later. During the 4 years leading up to trial Mr. Davis refused to take any plea offer and maintained his innocence throughout his malicious

prosecution.  During the trial Officer Martiny repeatedly gave false testimony, consequently causing his testimony to be impeached by defense counsel.

21.     The Court gave judicial notice to the jury because of the prosecution's

failure to turn over exculpatory evidence to the defense, a Brady violation.  Det. Asman also testified, again giving false testimony under oath in conspiracy with Det. Martiny to conceal the malicious prosecution of Mr. Davis, based upon racial profiling. As Det. Asman did not at any time on October 31, 2007 into November 1, 2007 stop Mr. Davis at any location. Furthermore, Mr. Davis has never had any encounter with Det. Asman and has only seen this Detective on two occasions, at the suppression and at trial.

22.     On December 19, 2011 Mr. Davis was acquitted of all charges by a jury of his

peers.  Almost 4 years later, more than 100 court appearance, over $30,000.00 in legal fees, Mr. Davis finally had an end to a nightmare that began on November 1, 2007, because of Officer Martiny's malicious prosecution of Mr. Davis, a violation of Mr. Davis' constitutional rights under the United States Constitution.

23.     Det. Martiny changes his testimony during the trial on cross examination, upon

realizing that that his fabricated testimony during the suppression hearing does not coincide with the physical layout of the scene of the incident, after having visited the scene with prosecutor's post-suppression hearing and prior to the trial.

24.     On November 28, 2011, the following was stated on the record by the Court"All

7

right, Detective. We have been discussing issues related to the fact of when

you learned that your original suppression hearing testimony was inaccurate. This particularly in

reference to the defendant's squeezing between some area between the fence and the alleyway.

Okay? Now, we are for the record clearly outside of the presence of the jury and I am inquiring

of the witnesses. Now, it is not in fact the case, Detective, that shortly after the original

suppression hearing was held, and I want to be very clear on dates again, so just bear with me. I

will look at the court file again for the record. Shortly after the original suppression hearing was

held and the report—there was a decision by a judicial hearing officer dated October 22, 2009

and then a Judge ruled that he was suppressing the gun, detective. Isn't it fact that within a short

time after that, within weeks or certainly within a month of that decision you went out with

certain ADA's from the Queens D.A.'s Office, actually Appeals Bureau D.A.'s to figure out

whether or not, you know, to get a sense of what the scene looked like. And also to determine

whether or not you were actually accurate in your pretrial suppression hearing. And we are going

back to when I say 2008, do you recall doing that? We are talking like three years before you just

visited the scene recently. Do you remember doing that with other ADA's?"

25.    Det. Martiny:" Yes, Your Honor."

26.    The Court: "Because right now as things stand the jury has heard that was in the

last couple of weeks you learned you were mistaken, that's not correct, correct?"

27.    Det. Martiny:" Correct, Your Honor."

28.    The Court: "So you do recall going to the scene, that was after the original Judge

said I am suppressing the gun. You know what that means, right?"

29.     Det. Martiny: "Yes, Your Honor."

30.     The Court: "The D.A. can't use the gun, there is no gun, there is no gun case anymore. So you went out to the scene with certain A.D.'s?

31.     Det. Martiny: "Yes, that's correct."

32.     The Court: "It was at that point that you told them, no, I could not have been correct in the way I testified at the original hearing. Correct?"

33.     Det. Martiny:" Correct. Your Honor."

34.     The Court: "There was one hearing at that point?"

35.     Det. Martiny:"Yes."

36.     The Court: "All right, just one moment."

37.     Defense Counsel: "Do you recall as to whose idea it was to go out to the scene? Was it yours or was it the district attorney's office."

38.     Det. Martiny: "I don't recall exactly who came up with the idea."

39.     Defense Counsel: "When you went out to the location is when you had realized not only."

40.     The Court: "Counsel, forgive me. I am going to ask him a question."

41.     Defense Counsel: "Yes, sure."

42.     The Court: "Sir, the D.A.'s office has a decision and they have to decide whether or not it is worth appealing. You get a judge who suppressed the gun, knocked it out. And without a gun

43.     I think you even understand that there is not going to be a gun case to go to trial."

44.     Det. Martiny: "Correct, Your Honor."

45.     The Court: "Okay. All right. So, would you have - - I mean does that sound correct to you that you would be calling up the appeal D.A.'s and say we better go back to the scene, or you think it was the other way around?"

46.     Det. Martiny: "Most likely the other way around."

47.     The Court: "I would think too. But continue, Mr. Rankin."

48.     Defense Counsel: "Thank you, Your Honor. Detective, they contacted you and asked you to come out to the scene after the gun was suppressed, right?"

49.     Det. Martiny: "Most likely, yes."

50.     Defense Counsel: When you get to the scene you inform them that - - well withdrawn" "what did you inform them of exactly when you got to the scene?"

51.     Det. Martiny:" I remembered discussing the testimony about the fence with them, and about the gap, the space between the fence."

52.     Defense Counsel: "Okay, and what did you say to them when you were discussing that testimony about the space between the fence?"

53.    Det. Martiny: "I looked at the fence and then I realized that as I testified before that a person couldn't fit through there like I described and I was mistaken."

54.    The Court: "Well, you actually, lets call it what it was, when you testified before the original pretrial issue you are saying he is squeezing between that gap and that was your recollection. I trust, at the time you testified before the pretrial hearing correct?"

55.    Det. Martiny: "I don't think I used the word squeezed. I think the cross used the word squeezed. And motioned through there and I said yes."

56.    The Court: "So you are saying you realized then upon that revisit to the scene with the D.A.'s from the Appeals Bureau that you were just wrong, incorrect, in describing it that way in your original testimony, correct?"

57.    Det. Martiny:" Correct."

58.    The Court: "and you told those D.A.'s that?"

59.    Det. Martiny: "Yes, that's what I said."

60.    The Court:  "did you also realize you were wrong in your original testimony regarding the perpetrator walking towards you prior to squeezing in between the fence?"

61.    Det. Martiny: "I don't think that came up at that time."

63.    The Court: "with the other District attorney's at the scene that did not come up?" Det. Martiny:" That didn't come up at the time", Court: but did at some point prior to this trial commencing, did you realize that you were also wrong about the perpetrator walking towards you and then subsequently going in-between the fence?"

64.     Det. Martiny: "I believe that testimony when I was reviewing this case with the ADA here today."

65.     The Court:  "So that's when you that's when the conversations regarding the perpetrator walking towards you, you realized that was wrong as well, correct?" Det. Martiny:" correct."

66.     The Court:  "and the part about the perpetrator walking towards you, you didn't get a chance to reveal to the prosecutors who went with you to the scene back in 2008?"

67.     The Court: "You are saying, I think I heard you correct but let's just nail this down on the record, that didn't come up, that issue?"

68.     Det. Martiny: "I don't remember that issue coming up."

69.     The Court: "You don't remember that issue coming up?"  How did—fast forward to 2011, how did you realize that the perpetrator didn't walk towards you now in 2011 when you didn't realize it back in 2008?"

70.     Det. Martiny: "I was presented with my testimony I read through it thoroughly just like it was another part in there where I said 109 Avenue when it was 109 Road. So I was mistaken about that.  I reviewed my testimony, Your Honor."

71.     The Court: "Let me cut to the chase. When you read through it now in preparation for this trial, well, let me back up. I assume, I hope, that in your final testimony now at this trial you are using your best recollection of what you remember happened at the time of the incident. Correct?"

72.     Det. Martiny: "Yes, Your Honor."

73.     The Court: "When you were reviewing your prior testimony in preparation for this trial and you compared that to your memory you said, no, this is still wrong, right?"

74.     Det. Martiny: "Yes."

75.     The Court: "In terms of him walking towards you?"

76.     Det. Martiny: "Yes."

77.     The Court: "you realized that was another instance where you had given incorrect testimony at an earlier time, correct?"

78.     Det. Martiny: "Yes."

79.     Det. Martiny has a history of committing false arrest, malicious prosecution and excessive force against New York City Civilians

80.     Det. Martiny has a history of being sued for false arrest, malicious prosecution and excessive force.

81.     In 2005, during Martiny's assignment at the 32nd Precinct, in Harlem, he was sued for false arrest and malicious prosecution, which the City of New York settled on his behalf.

82.     Consequently, within four (4) months of the incident Martiny was transferred from the 32nd Precinct to the 103rd Precinct, in Queens.

83.     Thereafter, in 2008 Det. Martiny was again sued for false arrest, malicious prosecution and excessive force and again the City of New York settled on his behalf.

13

84.     Det. Martiny was transferred from the 103rd precinct approximately six (6) months after the incident.

85.     Det. Martiny has since been transferred to the 113th Precinct in Queens, where he currently has a civil rights lawsuit pending against him for excessive force.

86.     During the trial, when asked by the prosecution whether it was outrageous that he, Det. Martiny had been sued three (3) times, Martiny stated "I think it is", "people want to sue the City and make some money, I mean, police officers are an easy target."

87.     On cross examination,   Det. Martiny went on to testify, "That's my personal feeling. As far as the city, some people look at the city to get a pay check, you know, if they want to sue the city, sometimes has deep pockets."


**NATURE OF DAVIS' INJURIES AND DAMAGES**


88.     (a)Suffered approximately four (4) years of constraints to his liberty in having to make over 100 court appearance with the threat of incarceration for failure to appear;

89.     (b) was publicly shamed, disgraced and humiliated and saw his academic career paced on hold for four years;

90.      (c) suffered and continues to suffer great emotional and mental pain and anguish;

91.     (d) suffered loss of earnings and permanent impairment of earning power;

92.     (e) had to pay, substantial attorney fees and related legal expenses in connection

with defending against criminal charges.

## AS AND FOR A FIRST CAUSE OFACTION

## (MALICIOUS PROSECUTION 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT MARTINY)

93.     That the Plaintiff repeats and re-alleges the allegations contained in paragraphs

**"1"** through **" 92"** of the complaint with the same force and effect as if fully set forth herein.

94.     MARTINY knowingly swore to a false criminal court complaint initiating

the criminal prosecution of PLAINTIFF.

95.     MARTINY Manufactured, or caused to be manufactured, false, unreliable

an/or misleading "evidence" intending it to be used by the prosecution in determining whether to

initiate criminal proceedings against PLAINTIFF, which "evidence" was used; MARTINY,

knowingly, willfully and/or with deliberate indifference to Plaintiff's constitutional rights , gave

false testimony under oath in the grand jury, suppression hearing and at trial.

96.     By virtue of the foregoing, MARTINY, with actual malice, initiated and

continued or caused the initiation and continuance of, criminal proceedings against PLAINTIFF

for which he knew or should have known there was no probable cause and for which in fact there

was no probable cause and thereby caused PLAINTIFF to be deprived of his liberty.

97.     Such proceeding ultimately was terminated in PLAINTIFF'S' favor.

98.     Additionally, MARTINY knew, but withheld from the grand jury, trial

judge, jury and defense either permanently or for a substantial period of time, exculpatory or

impeachment evidence that tended to negate PLAITNFIF'S' guilt and which he knew or should

have known the law required him to timely disclose. This evidence included but was not limited

to MARTINY'S having provided false testimony under oath during grand jury proceeding,

suppression hearing and jury trial.

99.     The aforementioned conduct which MARTINY committed, operated to

deprive PLAINTIFF of his rights under the constitution and laws of the United States.

100.    (a)Not be indicted and prosecuted upon false, fabricated, manufactured,

misleading or inherently unreliable "evidence" including statements, documents, and testimony

and ;

101.    (b) Not be deprived of his liberty absent probable cause to believe he has

committed a crime in violation of his rights under the Fourth and Fourteenth Amendments to the

United States Constitution; and

102.    The foregoing violations of PLAITNITFF'S' federal constitutional rights

by MARTINY substantially, proximately, and foreseeably caused the initiation and continuation

of PLAINTIFF'S' criminal prosecution, loss of liberty and other injuries and damages.

103.    The foregoing violations of PLAINTIF'S' rights amounted to

Constitutional torts and within the scope of MARTINY'S employment and authority.

104.    MARTINY committed the foregoing violations of PLAINTIFF'S rights

knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to

PLAINTIFF'S constitutional rights or to the effect of such misconduct upon PLAINTIFF'S

constitutional rights.

105.    The criminal matter was terminated in PLAINTIFF''s favor in that PLAINTIFF

was acquitted of all charges and the indictment was dismissed and sealed on December 19, 2011.

106.    By reason of the foregoing MARTINY is liable to PLAINTIFF, pursuant

to 42 U.S.C. section 1983, for compensatory and for punitive damages.

**DAMAGES DEMAND**

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

107.    For Compensatory damages of not less than $1million;

108.    For Punitive damages against the individual defendant of $2 million

109     For reasonable attorney's fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

110.    For pre-judgment interest as allowed by law; and

111.    For such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York

      January 9, 2013

                           Respectfully submitted,

                           TRACEY A. GRANT, ESQ.

                           Attorney I.D. tg2143

                           26 Court Street-Suite 714

                           Brooklyn, New York 11242

                           (718) 858-3000 (Phone)

                           (718) 858-9615 (Fax)

                           Email: Gra462@aol.com

                           *Attorney for the Plaintiff*

TO:  MICHAEL A. CARDOZO

Corporation Counsel of the

City of New York

Attorney for Defendant Martiny

100 Church Street

New York, New York 10007

Attn: Qiana Smith-Williams, Senior Counsel